STATE OF NORTH CAROLINA v. CLINTON RAY ROSE aka WAYNE RAYMOND GRICE

No. 32A92

(Filed 30 December 1994)

## 1. Criminal Law § 78 (NCI4th)— pretrial publicity—denial of change of venue

Defendant failed to establish that pretrial publicity prevented him from receiving a fair and impartial trial in the county on first-degree murder and armed robbery charges, and the trial court did not err in denying defendant's motion for a change of venue based on pretrial publicity, where many of the articles presented by defendant were factually based and followed the initial investigation and arrest; defendant's evidence showed virtually no coverage of the case the year before trial and that most jurors who had heard about the case could not remember specific details and had not formed opinions on defendant's guilt; the trial court conducted an initial screening to eliminate potential jurors who had formed opinions as to defendant's guilt or innocence, and the jurors who passed the initial screening were then subjected to a standard voir dire; and all jurors who actually sat either stated that they had no opinion as to guilt based on pretrial publicity or that they could set aside what they had heard or read and any opinion reached earlier.

**Am Jur 2d, Criminal Law § 378.**

**Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.**

**Pretrial publicity in criminal case as affecting defendant's right to fair trial—federal cases. 10 L. Ed. 2d 1243.**

## 2. Indigent Persons § 19 (NCI4th)— denial of funds for additional mental health expert—failure to show particularized need

The trial court did not abuse its discretion in the denial of defendant's motion in a first-degree murder and armed robbery

trial for funds to hire a neuropsychiatrist to determine whether defendant suffered from Fetal Alcohol Syndrome where defendant had already been examined and evaluated by two psychiatrists; these two psychiatrists had indicated that defendant suffered from alcohol abuse, and one had indicated that he suffered from other disorders as well; these psychiatrists were available to assist in evaluating, preparing and presenting his defense in both the guilt and sentencing phases; although defendant presented a neuropsychiatrist's affidavit that extensive neurological and neuropsychological examinations and testing would indicate whether defendant suffered from alcohol-related impairments, the affidavit did not indicate how such further testing would affect defendant's case; and defendant thus presented no evidence indicating a particularized need to establish that he was suffering from Fetal Alcohol Syndrome.

**Am Jur 2d, Criminal Law §§ 771, 1006.**

**Right of indigent defendant in state criminal case to assistance for psychiatrist or psychologist. 85 ALR4th 19.**

3. **Evidence and Witnesses §§ 354, 364 (NCI4th)— escape from prison—thefts—admissibility to show intent and motive for murders**

Chain-of-events evidence about defendant's escape from an Alabama prison and thefts he committed after his escape and before he committed the two murders at issue was properly admitted to establish defendant's intent and motive for the murders, and the trial court did not abuse its discretion by finding this evidence more probative than prejudicial. N.C.G.S. § 8C-1, Rules 403 and 404(b).

**Am Jur 2d, Evidence §§ 435, 448 et seq.**

**Admissibility, under Rule 404(b) of Federal Rules of Evidence, of evidence of other crimes, wrongs, or acts not similar to offense charged. 41 ALR Fed. 497.**

4. **Criminal Law § 375 (NCI4th)— lapsus linguae—no expression of opinion—absence of prejudice**

The trial court's question, "You are ready for the sentencing—sorry, charge conference at this time?" was not an expression of opinion as to defendant's guilt but was a mere *lapsus linguae* which was not prejudicial to the defendant since the lapse was immediately realized and corrected by the trial court.

**Am Jur 2d, Trial §§ 276 et seq.**

5. **Evidence and Witnesses § 116 (NCI4th)— conjecture of another's involvement in murders—testimony properly excluded**

The trial court did not err by excluding a detective's testimony that, immediately after investigating the murders at issue, he believed that a named person had knowledge of, and might have been involved in, the murders since this testimony constituted mere conjecture that another person was involved in the murders, did not point directly to another's guilt, and was not inconsistent with defendant's guilt.

**Am Jur 2d, Evidence § 587.**

6. **Homicide § 226 (NCI4th)— defendant as perpetrator of murders—sufficiency of evidence**

The State's evidence was sufficient for the jury to find that defendant was the perpetrator of two first-degree murders where it tended to show that defendant was living at a campsite about four-tenths of a mile from the victims' campsite; he had a motive to steal from the victims and kill them if discovered because he had escaped from jail and was hiding, stealing food and other supplies to survive; on 22 June 1990 defendant was seen walking toward the victims' campsite; the victims were killed by a 16-guage shotgun on 22 or 23 June; a 16-guage shotgun was found at defendant's campsite that had chambered and ejected shells that were found at the victims' campsite; a pair of boots with tread similar to an impression left all over the crime scene was also found there; the day after the murders defendant possessed many of the victims' goods, including a gold ring which had been worn by one victim on his left ring finger; this ring finger had been severed; on 24 June witnesses saw defendant acting nervous and brandishing a pistol; and defendant stated that "he was ready for anything if anything went on like what went on last night" and that "ain't nobody going to f— me no more."

**Am Jur 2d, Homicide § 435.**

7. **Robbery § 53 (NCI4th)— armed robbery—killings and recent possession of victims' goods—sufficiency of evidence**

The State's evidence was sufficient to support defendant's conviction of two armed robberies where it tended to show that

defendant killed the victims and possessed the victims' goods a few days after the killings.

**Am Jur 2d, Robbery §§ 62 et seq.**

**8. Homicide § 552 (NCI4th)— first-degree murder—instruction on second-degree murder not required**

The trial court did not err by refusing to instruct the jury on second-degree murder in this prosecution for two first-degree murders based on premeditation and deliberation where all the evidence tended to show that defendant went to the victims' campsite, shot them at close range, and then stole their possessions; one of one victim's fingers was cut off and a ring later found in defendant's possession was taken from his hand; one victim was sitting down with a blanket or pillow on his chest when shot, indicating lack of provocation on his part; defendant had a motive to steal from the victims and kill them if discovered because he had escaped from prison, was hiding, and was stealing food and other supplies to survive; and after the murders defendant was heard talking about how no one was going to "f— with him no more" and that "he was ready for anything if anything went on like what went on last night." Evidence that a hunting knife was found under one victim's body, that this victim was standing when shot, and that the two victims drank on camping trips was insufficient to support an inference that defendant shot the victims spontaneously during an altercation without premeditation and deliberation.

**Am Jur 2d, Homicide §§ 525 et seq.; Trial §§ 1427 et seq.**

**Lesser-related state offense instructions: modern status. 50 ALR4th 1081.**

**9. Criminal Law § 465 (NCI4th)— reasonable doubt—jury argument—no due process violation—error cured by instruction**

The prosecutor's closing argument on reasonable doubt that it was sufficient if the jurors "believed basically" that defendant was guilty and that they could find defendant guilty if their doubts were no greater than the substantial level of uncertainty confronted by farmers when they plant each year did not lower the State's burden of proof in violation of defendant's due process rights where it is clear when the argument is viewed in its entirety that the prosecutor was indicating to the jurors that they did

not have to have "absolute certainty" to find defendant guilty. Moreover, the trial court's correct instruction on reasonable doubt, which followed the complained-of statement by the prosecutor, remedied the error, if any, in the prosecutor's closing argument.

**Am Jur 2d, Trial § 640.**

**10. Criminal Law §§ 1337, 1347 (NCI4th)— capital sentencing—aggravating circumstances—course of conduct—prior violent felony—submission of both—no error**

The trial court did not err by submitting both the "course of conduct" and "prior violent felony" aggravating circumstances in a capital sentencing proceeding for two first-degree murders where evidence of defendant's conviction of an Alabama murder supported the finding of a prior conviction of a violent felony, and the murder of each of the victims in this case supported the finding of a course of violent conduct in the sentencing for the murder of the other victim. Considering the instructions in their entirety and in context, the trial court's instruction directing the jury to consider whether defendant was involved in a course of violent conduct "on or about the alleged date" of the murders of the two North Carolina victims could not have been interpreted by the jury to mean that the murder of the Alabama victim could be considered as a part of the course of violent conduct that included the much later murder of the victims in this state.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that defendant was previously convicted of or committed other violent offense, had history of violent conduct, posed continuing threat to society, and the like—post-*Gregg* cases. 65 ALR4th 838.**

**11. Criminal Law § 1320 (NCI4th)— capital sentencing—two aggravating circumstances—failure to instruct not to consider same evidence—no plain error**

The trial court did not commit plain error by failing to instruct the jury in a capital sentencing proceeding without a request by defendant that it should not consider the same evidence for both the "course of conduct" and "prior violent felony"

STATE v. ROSE

[339 N.C. 172 (1994)]

aggravating circumstances since this failure did not have a probable impact on the jury's finding of these circumstances.

**Am Jur 2d, Trial §§ 1441 et seq.**

**12. Criminal Law § 1312 (NCI4th)— capital sentencing—circumstances of prior crimes—admissibility to show conviction of violent felony aggravating circumstance**

An F.B.I. agent's testimony about the circumstances surrounding a murder committed by defendant in Alabama, and his testimony about the circumstances surrounding a kidnapping by defendant in Oregon as related to him by the victim, was relevant to sentencing defendant for two murders in this state and was properly admitted in this capital sentencing proceeding to support the prior conviction of a violent felony aggravating circumstance, notwithstanding the State had offered certified copies of court documents to establish defendant's convictions for those crimes, defendant had not presented evidence of his good character, and the testimony about the kidnapping was hearsay.

**Am Jur 2d, Evidence §§ 427 et seq.**

**Court's right, in imposing sentence, to hear evidence of, or to consider, other offenses committed by defendant. 96 ALR2d 768.**

**13. Criminal Law § 455 (NCI4th)— capital sentencing—prosecutor's argument—possibility of another escape and murder**

Where defendant had escaped from prison in Alabama after being sentenced to life imprisonment for murder, the prosecutor could properly argue to the jury in a capital sentencing proceeding that defendant might again escape and kill if given a life sentence for two murders in this state.

**Am Jur 2d, Trial §§ 572 et seq.**

**Propriety, under Federal Constitution, of evidence or argument concerning deterrent effect of death penalty. 78 ALR Fed. 553.**

**14. Criminal Law § 454 (NCI4th)— capital sentencing—prosecutor's argument—Biblical references**

The prosecutor's jury argument in a capital sentencing proceeding that the Bible states that those who have committed mur-

der should be punished with death was not so grossly improper as to require *ex mero motu* intervention by the trial court.

**Am Jur 2d, Trial §§ 572 et seq.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

15. **Criminal Law § 1350 (NCI4th)— capital sentencing—mitigating circumstances—incorrect response by jury foreman—written response on recommendation form—all circumstances considered**

Where the jury was instructed as to mitigating circumstance five, and the issues and recommendation form carried into deliberations indicated that at least one juror had found this circumstance to exist and have mitigating value, the jury foreman's response to an inquiry by the court indicating that the jury had rejected mitigating circumstance five did not show that the jury did not pass on the existence of all mitigating circumstances so as to entitle defendant to a new sentencing hearing.

**Am Jur 2d, Criminal Law §§ 598, 599.**

16. **Criminal Law § 1373 (NCI4th)— two murders—death sentences not disproportionate**

Sentences of death imposed upon defendant for two first-degree murders were not excessive or disproportionate to the penalty imposed in similar cases, considering the crimes and the defendant, where the jury found the course of conduct, prior violent felony and murder during the commission of armed robbery aggravating circumstances; defendant had escaped from a minimum security prison in Alabama while serving a life sentence for a previous murder; while on escape defendant murdered the two victims by shooting them at close range, stole many of their possessions, and cut off one victim's finger in order to steal a ring; and defendant did not assist his victims.

**Am Jur 2d, Criminal Law § 628.**

**Validity of death penalty, under Federal Constitution, as affected by consideration of aggravating or mitigating circumstances—Supreme Court cases. 111 L. Ed. 2d 947.**

**STATE v. ROSE**

[339 N.C. 172 (1994)]

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing two sentences of death entered by Wood, J., at the 2 December 1991 Criminal Session of Superior Court, Rockingham County. Defendant's motion to bypass the Court of Appeals as to additional judgments imposing sentences of imprisonment entered upon his conviction for two counts of robbery with a dangerous weapon was allowed 23 August 1993. Heard in the Supreme Court 14 April 1994.

*Michael F. Easley, Attorney General, by John H. Watters, Special Deputy Attorney General, for the State.*

*Burton Craige for defendant-appellant.*

WHICHARD, Justice.

Defendant was convicted of the first-degree, premeditated and deliberated murders of Richard Dean Connor and Larry Dale Connor. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended, and the trial court entered, a sentence of death for each murder. Defendant was also convicted of the armed robbery of each victim and sentenced to a forty-year term of imprisonment for each robbery. We conclude that the trial was free from prejudicial error, and that the death sentences are not disproportionate.

On 23 April 1990 defendant, Clinton Ray Rose, escaped from a minimum security prison in Alabama. Sometime in May, Allen Wagner saw him on the Mayo River off Anglin Mill Road in Rockingham County where defendant had set up a campsite. Wagner talked to defendant on one occasion, and defendant introduced himself as Wayne Grice. Defendant also met Steve Harvey and John Nance while camping on the river.

While camping defendant would go regularly to Dalton's Market, a mile or a mile and a half from the campsite, to buy a cookie and a Pepsi. On 10 June 1990 someone broke into Dalton's; beer, money, and canned foods were stolen. Defendant did not return to Dalton's following the robbery.

On 22 June 1990, while David Stanley's truck was parked near the river, his pistol was stolen from the truck. On 22 June 1990, while Steve Harvey was at the river, he saw defendant and talked to him for a few minutes around dusk. The two men began walking on Anglin Mill Road. During the walk Harvey passed the tents and truck of the victims, Larry and Richard Connor. Defendant wanted to see if the

**STATE v. ROSE**

[339 N.C. 172 (1994)]

victims would give him some beer; Harvey did not go with defendant into the victims' campsite.

Allen Wagner saw defendant early in the morning on 24 June 1990. Defendant was carrying a camera, was dressed better than normally, and had several watches and a Browning automatic .22-caliber pistol with him. He also showed Wagner money he had in his billfold. Later that day John Nance saw defendant at the river. Defendant was carrying a .22-caliber pistol and appeared nervous. Defendant began talking to Nance and to Jerry Lester, Billy Anders and Patty Best, who were with Nance. Lester testified that defendant had the pistol out and was waving it around, stating that "he was ready for anything if anything went on like what went on last night." Defendant also noted that "ain't nobody going to f—— me no more."

Thomas Holliman also saw defendant on 24 June 1990. Holliman recognized the .22-caliber pistol defendant was carrying as the one lost by his friend David Stanley on 22 June 1990. Holliman told defendant his friend would give a reward if he was given back his gun. Defendant said the gun was given to him by his brother, who had bought it in Greensboro.

On 25 June 1990 Deputy Sheriff Mike James received information that Larry Dale Connor and Richard Dean Connor were missing. That evening he spotted the Connors' red GMC pickup truck in a camping area off of Anglin Mill Road next to the Mayo River. James investigated the campsite and saw two tents but no people. After noticing that the right side window of the pickup truck had been broken, James called for assistance.

Sheriff's Deputy Hutchinson, an off-duty officer who lived in the area, was the next officer to arrive at the scene. Hutchinson and James began to search the area. James went to unzip one of the tents and noticed a strong odor. He then saw one of the victims, who appeared dead, in a lawn chair. James radioed Sergeant Lunsford, who was en route to the scene, and told him what he had found.

David Hudson, a crime scene investigation and identification officer, arrived later. He photographed the area and took fingerprints. Hudson noticed impressions of tennis shoes and heavy-soled shoes, such as hiking boots, in the area. He also found four shotgun shells in the area of the victims' tents. Hudson then discovered the bodies of Larry and Richard Connor. Larry was lying face down on his left arm; when he was turned over, Hudson observed a large wound to his

chest and a hunting knife near his left arm. Richard was sitting in a lounge chair; he had a large wound over his right eye, and one of his fingers had been cut off.

Defendant's campsite was about a quarter of a mile away. Officers went there around 9:30 a.m. on 26 June 1990. Defendant identified himself as Wayne Grice; he did not attempt to leave when the officers arrived. Deputy Hudson went to defendant's campsite to investigate on that same day.

Deputy Hudson found a cooler with Rick Connor's name on it at defendant's campsite. Hudson also saw a pair of work boots with a pattern similar to that he had seen at the victims' campsite, as well as a 16-gauge shotgun. Scott Connor, the son of Richard Connor, testified that a camera found at defendant's campsite was his and that he had loaned it to his father before his father went camping. Scott also identified other items found at defendant's campsite as his father's, including: a Craftsman tool kit, a brown tent bag, a lounge chair, a sleeping bag, a hatchet, a wristwatch, tennis shoes, fishing rods, a checkbook, and a diamond ring.

Debra Grubbs was living with Larry Connor in June of 1990. She identified camouflage pants and Nike tennis shoes which were being worn by defendant on 26 June 1990 as being the clothes Larry had worn the day he went camping.

Annie Cassidy, who worked at Dalton's Market, identified a number of items found at defendant's campsite as having come from her store. She identified the goods based on the handwritten price stickers found on the food items. She also testified that some were items stolen from the Market on 10 June 1990.

A 16-gauge Mossburg, bolt-action shotgun also was found at defendant's campsite. Michael Gavin, a Special Agent for the State Bureau of Investigation, concluded that a 16-gauge shell found at the victims' campsite had been chambered in and ejected from this shotgun. The shotgun waddings and pellets recovered from the victims' bodies and the crime scene were consistent with waddings and pellets in Remington's 16-gauge shells.

Dr. Robert Thompson performed an autopsy on Larry Connor on 26 June 1990. He determined that Larry had been dead about three or four days. He had been shot from a distance of about four feet; the bullet had run from left to right, backward, and slightly upward. Larry died from the shot to his heart and the bleeding that resulted. Dr.

Thompson testified that Larry would not have died instantly but could have lived eight to ten minutes after he was shot.

Dr. Thompson also participated in Richard Connor's autopsy. Richard seemed to have been dead for the same period as Larry. He had died from a shotgun wound to the head; the gun had been fired from a distance of three to four feet. The shotgun wound track appeared to go downward, slightly to the left, and then slightly backward. The autopsy also noted that Richard's ring finger had been cut off.

Defendant presented no evidence during the guilt phase.

During sentencing evidence was presented that defendant had been convicted of the first-degree murder of Gary Fidslar and sentenced to life in prison in Alabama in 1975. Defendant also had been convicted of the second-degree kidnapping of Michael O'Malley in Oregon.

Defendant presented evidence at sentencing that he had not stolen from a family he had met on the river, even though the members were camped next to him and left their campsite—with a new gas grill, diamond set, rifle, and shotgun in it—unattended. He had taken care of himself while growing up in a family of bootleggers. He was a good artist and would draw pictures and sell them or give them to people he met in the area.

### PRETRIAL PHASE

[1] In his first assignment of error, defendant argues the trial court erred in denying his motion for a change of venue. He contends he could not obtain a fair and impartial trial in Rockingham County, as virtually the entire jury pool was familiar with media reports containing information that would have been inadmissible in the guilt phase of his trial—information guaranteed to predetermine his guilt.

In his motion defendant noted that information about the crime and his criminal history had permeated the county through the press, other media, and community discussion. In support of his motion, defendant introduced twenty-seven articles addressing (i) the killing of the victims, (ii) the fact that he had escaped from an Alabama prison while serving a life sentence for murder, and (iii) the fact that he had attempted to escape from prison in Rockingham County while awaiting this trial. The last article submitted had been published in

December 1990. Most had appeared in the papers in June and July 1990, immediately after the murders.

Defendant presented a local attorney who stated that the deaths had been a regular topic of conversation in the area where he lived, near where the murders had occurred. The discussions included the fact that defendant had been charged with murder in Alabama. The witness also testified, however, that he had not heard any conversation about the case in a number of months.

Judge Preston Cornelius denied the motion at the 16 September 1992 Criminal Session of Superior Court, Rockingham County. Defendant renewed the motion at the beginning of his trial, noting that two articles on commencement of the trial had been published since the motion was previously made. Judge Wood denied the motion but did allow for individual questioning of jurors on the issue of pretrial publicity and their feelings on capital punishment.

The statute pertaining to change-of-venue motions provides:

If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:

(1) Transfer the proceeding to another county in the prosecutorial district as defined in G.S. 7A-60 or to another county in an adjoining prosecutorial district as defined in G.S. 7A-60, or

(2) Order a special venire under the terms of G.S. 15A-958.

N.C.G.S. § 15A-957 (1988). The test for determining whether a change of venue should be granted due to pretrial publicity is whether "there is a reasonable likelihood that the defendant will not receive a fair trial." *State v. Jerrett*, 309 N.C. 239, 254, 307 S.E.2d 339, 347 (1983).

[A] defendant's motion for a change of venue should be granted when he establishes that it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed.

. . . .

Our cases indicate that a defendant, in meeting his burden of showing that pretrial publicity precluded him from receiving a

fair trial, must show that jurors have prior knowledge concerning the case, that he exhausted peremptory challenges and that a juror objectionable to the defendant sat on the jury. In deciding whether a defendant has met his burden of showing prejudice, it is relevant to consider that the chosen jurors stated that they could ignore their prior knowledge or earlier formed opinions and decide the case solely on the evidence presented at trial.

*Id.* at 254-55, 307 S.E.2d at 347-48 (citations omitted). "The burden of proving the existence of a reasonable likelihood that he cannot receive a fair trial because of prejudice against him in the county in which he is to be tried rests upon the defendant." *State v. Yelverton,* 334 N.C. 532, 540, 434 S.E.2d 183, 187 (1993). The determination of whether a defendant has carried his burden of showing that pretrial publicity precluded him from receiving a fair trial rests within the trial court's sound discretion. *Id.*

From our review of the jury *voir dire* and materials submitted by both defendant and the State, we are satisfied that defendant failed to meet his burden of proving that pretrial publicity tainted his chances of receiving a fair and impartial trial. Many of the articles at issue were factually based and followed the initial investigation and arrest. "This Court has consistently held that factual news accounts regarding the commission of a crime and the pretrial proceedings do not of themselves warrant a change of venue." *State v. Gardner,* 311 N.C. 489, 498, 319 S.E.2d 591, 598 (1984), *cert. denied,* 469 U.S. 1230, 84 L. Ed. 2d 369 (1985).

In addition, the trial court protected defendant from being judged by anyone who would not base a decision of guilt or innocence solely on the evidence. All jurors who actually sat either stated that they had no opinion as to guilt based on pretrial publicity or that they could set aside what they had heard or read and any opinion reached earlier. Defendant thus did not show he had been prejudiced by pretrial publicity.

Further still, to assure a fair and impartial venire the trial court conducted an initial individual screening to eliminate potential jurors who had formed opinions as to defendant's guilt or innocence. While a majority had heard or read something about the case, they had not formed an opinion on defendant's guilt based on the evidence. The court excused potential jurors who had formed an opinion that they could not put aside. The jurors who passed the initial screening were then subjected to a standard *voir dire.*

Thus, noting that defendant's evidence showed virtually no coverage of the case the year before trial and that most jurors who had heard about the case could not remember specific details and had not formed opinions of defendant's guilt, we conclude that defendant did not establish that pretrial publicity prevented him from receiving a fair and impartial trial in Rockingham County. We hold, therefore, that the trial court did not err in denying defendant's motion for a change of venue.

[2] Defendant next contends the trial court erred by denying his motion for funds to hire an additional independent medical expert and his related motions for a continuance. Defendant renewed the motion for an expert at the beginning of the sentencing phase, and it was again denied.

On 18 July 1990 defense counsel sought an order committing defendant to Dorothea Dix Hospital. The record does not reflect a ruling on this motion. On 14 November 1990 defense counsel renewed his motion, requesting that defendant

> be examined to determine whether by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings and to assist in his defense in a rational or reasonable manner, and that he be examined to determine his psychological condition and his general state of mental health.

Defendant was transported to Dorothea Dix on 14 November 1990. He was examined by Dr. Patricio P. Lara, who diagnosed him as suffering from an adjustment disorder with mixed disturbance of emotions and conduct, a nonspecified personality disorder, alcohol abuse, and possible dependence on anxiolytics. Dr. Lara determined that defendant was capable of standing trial.

On 25 July 1991 defendant made a motion for funds with which to hire a psychologist to aid in his defense. He argued that the commitment order did not direct Dr. Lara to evaluate him to determine whether he had the capacity to premeditate or deliberate any of the offenses or to appreciate the criminality of his conduct, or to determine if there were other mitigating circumstances relating to his mental or emotional background. The trial court authorized defendant to expend $1,500 for a psychologist.

STATE v. ROSE

[339 N.C. 172 (1994)]

On 2 December 1991, before the trial began, defendant filed a motion for continuance. He asked that the case be continued until he had been further tested and examined by another psychiatric or psychological expert. At that time Dr. Faye Sultan, a psychologist, had interviewed defendant. Dr. Sultan had informed defendant's counsel that defendant's mental and emotional condition at the time of the crime, as well as at that time, were possibly affected and influenced by Fetal Alcohol Syndrome. She believed defendant should be tested and examined by a neuropsychiatrist. Defendant had received the name of a neuropsychiatrist but had been unable to contact him due to the Thanksgiving holidays. Defendant stated that further examination was crucial to his defense, particularly during the sentencing phase.

Defendant filed another motion to continue on 16 December 1991, the day before the jury reached a verdict. With this motion, he filed an affidavit from Dr. Sultan averring that he could have been suffering from Fetal Alcohol Syndrome. Dr. Sultan also indicated she was not qualified to perform testing for this condition. Dr. Claudia Coleman, who was qualified to do so, reviewed Dr. Sultan's affidavit and the psychological report from Dorothea Dix. Dr. Coleman filed an affidavit indicating the likelihood that defendant suffered from neurobehavioral and cognitive deficits because of his drinking and/or his mother's perinatal drinking. Dr. Coleman stated that she would be better able to determine the extent of alcohol impairment if she could perform a neuropsychological and neurological evaluation. Her charge for such an evaluation was between $2,500 and $3,000, and she would not be able to evaluate defendant until after 20 December 1991. The trial court denied both of defendant's motions to continue.

An indigent defendant is entitled to the assistance of an expert in preparation of his defense when he makes a " 'particularized showing that (1) he will be deprived of a fair trial without the expert assistance, or (2) there is a reasonable likelihood that it would materially assist him in the preparation of his case.' " *State v. Ballard,* 333 N.C. 515, 518, 428 S.E.2d 178, 179, *cert. denied,* —— U.S. ——, 126 L. Ed. 2d 438 (1993) (quoting *State v. Parks,* 331 N.C. 649, 656, 417 S.E.2d 467, 471 (1992))."The statutory and common law principles governing the appointment of an expert witness for an indigent defendant are well settled." *State v. Mills,* 332 N.C. 392, 400, 420 S.E.2d 114, 117 (1992).

The court, in its discretion, may approve a fee for the service of an expert witness who testifies for an indigent person, and shall

approve reimbursement for the necessary expenses of counsel. Fees and expenses accrued under this section shall be paid by the State.

N.C.G.S. § 7A-454 (1986).

"The particularized showing demanded by our cases is a flexible one and must be determined on a case-by-case basis." *State v. Parks*, 331 N.C. at 656-57, 417 S.E.2d at 471. The determination of whether a defendant has made an adequate showing of particularized need lies within the trial court's discretion. *State v. Mills*, 332 N.C. at 400, 420 S.E.2d at 117.

This Court recognized the constitutional implications of an indigent defendant's request for expert assistance nearly a decade before the United States Supreme Court decided *Ake v. Oklahoma*, 470 U.S. 68, 84 L. Ed. 2d 53 (1985), the landmark case which guaranteed indigent defendants the right to expert assistance under certain circumstances.

*State v. Parks*, 331 N.C. at 655, 417 S.E.2d at 471. "[W]hat is required by *Ake* is that a 'defendant be furnished with a competent psychiatrist for the purpose of not only examining defendant but also assisting defendant in evaluating, preparing, and presenting his defense in both the guilt and sentencing phases.'" *Id.* at 659, 417 S.E.2d at 473 (quoting *State v. Gambrell*, 318 N.C. 249, 259, 347 S.E.2d 390, 395 (1986)).

We conclude that the trial court did not abuse its discretion when it denied defendant's motions to continue so he could be evaluated by a neuropsychologist. Defendant had already been examined and evaluated by two psychiatrists, Dr. Lara and Dr. Sultan. Dr. Lara had indicated that defendant was suffering from an adjustment disorder with mixed disturbance of emotions and conduct, a nonspecified personality disorder, alcohol abuse, and possible dependence on anxiolytics. Dr. Lara also concluded that if further evidence was presented that the patient was intoxicated at the time of the crime, his condition as a result of the intoxication should be considered to represent impairment of his capacity to conform his actions within limits established by law. There was no evidence that such diagnosis required evaluation by a neuropsychologist, yet defendant chose not to allow Dr. Lara to assist him in his defense. Dr. Sultan also noted that defendant suffered from long-term alcohol and substance abuse, and indicated the possibility that defendant suffered from some mental or neuro-

logical impairment. Defendant also chose not to call Dr. Sultan to testify in his defense.

In his motion defendant presented the affidavit of Dr. Coleman indicating that extensive neurological and neuropsychological examinations and testing would indicate whether defendant suffered from alcohol-related impairments. The affidavit, however, did not indicate how such further testing would affect defendant's case. Two other psychiatrists had already indicated that defendant suffered from alcohol abuse, and one had indicated that he suffered from other disorders as well. Defendant presented no evidence indicating a particularized need to establish that he was suffering from Fetal Alcohol Syndrome.

On these facts, defendant failed to demonstrate a particularized need to have a third expert examine him. Defendant was furnished with two competent psychiatrists who examined him and were available to assist in evaluating, preparing, and presenting his defense in both the guilt and sentencing phases. The trial court did not abuse its discretion in determining that defendant did not establish a particularized showing that without an evaluation by a neuropsychologist, defendant would be deprived of a fair trial or that there was a reasonable likelihood that a neuropsychologist would materially assist him in the preparation of his case. This assignment of error is overruled.

GUILT PHASE

[3] Defendant next argues that the trial court erred by overruling his objections to testimony about his escape from an Alabama prison and thefts he committed after the escape and before the murders. George McKinney testified that defendant had escaped from an Alabama minimum security prison on 23 April 1990. Annie Cassidy testified that there was a break-in at her grocery store either late in the evening on 10 June 1990 or early in the morning on 11 June 1990. She identified food items found at defendant's campsite as having come from, or being the type of items stolen from, her store. John David Stanley testified that a .22-caliber weapon was stolen from his vehicle, which was parked in the Anglin Mill Road area, on 22 June 1990. Wayne Holliman, a friend of Stanley's, testified that he saw defendant with the weapon on 24 June 1990. The weapon was seized at defendant's campsite on 26 June 1990.

Defendant argues that the only probative value of this evidence was to show that he had the propensity or disposition to commit an offense of the nature charged, which violates N.C.G.S. § 8C-1, Rule

404(b). Even if the evidence was properly admitted under Rule 404(b), he contends, any probative value was outweighed by its prejudicial effect, which violates N.C.G.S. § 8C-1, Rule 403.

The State argues that the evidence presented facts in a chain of circumstances leading up to the murders that indicated defendant's willingness to support himself by any means necessary. The instances all established a motive for murdering the victims, or that defendant needed goods to survive and to avoid apprehension. Defendant argues, however, that the evidence could not support the theory that he killed the victims to avoid apprehension because a double murder would generate an intensive search of the area and cause him to be discovered.

> "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or [if it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury."

*State v. Agee*, 326 N.C. 542, 548, 391 S.E.2d 171, 174 (1990) (quoting *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985)). The Court in *Agee* held that such evidence could be admitted even if it was evidence of other crimes, wrongs, or acts if it was admitted to establish a chain of circumstances leading up to the crime charged. *Id.* at 550, 391 S.E.2d at 175-76. Rule 404(b) is a rule of inclusion "subject to but *one exception* requiring [the] exclusion [of evidence] if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 279, 389 S.E.2d 48, 54 (1990).

In *State v. Bray*, 321 N.C. 663, 365 S.E.2d 571 (1988), evidence was presented that the defendant there had escaped from jail, stolen a truck and a rifle, and killed a state trooper. The defendant argued that the trial court erroneously admitted testimony about his escape and the stolen truck and rifle. *Id.* at 675, 365 S.E.2d at 578. This Court held the testimony admissible to show intent and motive. The "testimony shows that defendant and Rios [codefendant] intended to escape from jail, then do whatever was necessary to avoid capture, and therefore that they had a motive for killing [the trooper]. The chain of events from the time of their escape demonstrates their attempt to avoid apprehension." *Id.* The Court also found that the probative value of the testimony outweighed any possible unfair prej-

udice to defendant and that the evidence was correctly admitted pursuant to N.C.G.S. § 8C-1, Rules 403 and 404(b). *Id.* at 675, 365 S.E.2d at 579; *see also State v. Meekins*, 326 N.C. 689, 699-700, 392 S.E.2d 346, 351 (1990) (permissible to cross-examine defendant about a pending rape charge because it established intent and motive for murder and robbery to obtain a means of escape).

We conclude that the chain-of-events evidence here was properly admitted to establish defendant's intent and motive for the murders at issue, and that the trial court did not abuse its discretion by finding the evidence more probative than prejudicial. This assignment of error is overruled.

[4] Defendant next contends the trial court erred by expressing an opinion as to his guilt. At the conclusion of the State's case and prior to closing arguments, the following colloquy occurred:

> COURT: Now the State has rested. Anything for the defendant?
>
> MR. STULTZ: The defendant does not choose to offer any evidence, Your Honor.
>
> COURT: You are ready for the sentencing—Sorry, charge conference at this time?

Defendant argues this was an improper expression of opinion in contravention of N.C.G.S. § 15A-1222 and § 15A-1232, and that it came at a critical time because the jury was waiting to hear from him and instead heard the court express an opinion as to his guilt.

In *State v. Hill*, 237 N.C. 764, 75 S.E.2d 915 (1953), this Court held that a *lapsus linguae* potentially indicating an expression of opinion was not prejudicial error. The trial court there was charging the jury when it stated: "So the Court says and contends that your verdict upon this evidence should be that of guilty as charged in the bill of indictment." *Id.* at 765, 75 S.E.2d at 916. The prosecutor pointed out that the charge should have been prefaced by the words "the State contends." *Id.* The trial court immediately corrected the charge, and this Court found that "no prejudicial harm" resulted.

Likewise, in *State v. Kennedy*, 320 N.C. 20, 34, 357 S.E.2d 359, 367 (1987), the trial court inadvertently stated "victim" instead of "alleged victim" when listing the offenses for prospective jurors. Defendant argued that this was an impermissible expression of opinion; this Court held that the remark was a mere *lapsus linguae* that did not prejudice the defendant. *Id.* at 34, 357 S.E.2d at 368.

We conclude that the statement here was also a mere *lapsus linguae*. The lapse was immediately realized and corrected by the trial court and was not prejudicial. This assignment of error is overruled.

**[5]** Defendant next argues the trial court erred by not allowing him to ask Detective Oakley if he had an opinion about the number of people involved in the murders. During an offer of proof, Oakley stated that immediately after investigating the murders he believed there was a strong possibility that Steve Harvey had knowledge of, and might have been involved in, the murders. Defendant argues that this statement should have been admitted because it was relevant evidence which showed that someone else committed the murders.

> [W]here the evidence is proffered to show that someone other than the defendant committed the crime charged, admission of the evidence must do more than create mere conjecture of another's guilt in order to be relevant. Such evidence must (1) point directly to the guilt of some specific person, and (2) be inconsistent with the defendant's guilt.

*State v. McNeill*, 326 N.C. 712, 721, 392 S.E.2d 78, 83 (1990).

> "Evidence which tends to show nothing more than that someone other than the accused had an opportunity to commit the offense, without tending to show that such person actually did commit the offense and that therefore the defendant did not do so, is too remote to be relevant and should be excluded."

*State v. Brewer*, 325 N.C. 550, 564, 386 S.E.2d 569, 576 (1989) (quoting *State v. Britt*, 42 N.C. App. 637, 641, 257 S.E.2d 468, 471 (1979)), *cert. denied*, 495 U.S. 951, 109 L. Ed. 2d 541 (1990). The evidence at issue presents mere conjecture that Harvey was involved in the murders. It does not show that defendant did not commit them.

Defendant notes that in *State v. McElrath*, 322 N.C. 1, 366 S.E.2d 442 (1988), and *State v. Sneed*, 327 N.C. 266, 393 S.E.2d 531 (1990), evidence pointing toward another person's commission of the crimes at issue was held admissible. In *McElrath* and *Sneed*, however, the evidence at issue both exculpated the defendant and inculpated another. That is not true of the evidence here, which simply indicated that one person felt that Harvey might have been "involved." This evidence was not inconsistent with defendant's guilt.

Defendant also argues that to require that evidence point directly to another's guilt *and* be inconsistent with defendant's guilt contra-

**STATE v. ROSE**

[339 N.C. 172 (1994)]

venes the liberal interpretation of relevance mandated by N.C.G.S. § 8C-1, Rule 401. He presents no authority to support his position that only one prong of the test must be satisfied, however. This Court has consistently required that such evidence satisfy both prongs. *See, e.g., State v. Annadale*, 329 N.C. 557, 575, 406 S.E.2d 837, 848 (1991); *State v. Sneed*, 327 N.C. at 271, 393 S.E.2d at 533; *State v. McNeill*, 326 N.C. at 721, 392 S.E.2d at 83; *State v. Brewer*, 325 N.C. at 564, 386 S.E.2d at 577; *State v. Cotton*, 318 N.C. 663, 667, 351 S.E.2d 277, 279-80 (1987).

Defendant also argues that exclusion of the proffered evidence deprived him of his due process right to present evidence in his defense, in violation of the Fourteenth Amendment. This argument was not made to the trial court and thus is not properly before us. *State v. Benson*, 323 N.C. 318, 312-22, 372 S.E.2d 517, 519 (1988).

We conclude that the evidence at issue was not relevant as it was mere conjecture that someone else was involved and was not inconsistent with defendant's guilt. This assignment of error is overruled.

**[6]** Defendant argues that denial of his motion to dismiss was error. "When a defendant moves for dismissal, the trial court is to determine whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of defendant's being the perpetrator of the offense." *State v. Earnhardt*, 307 N.C. 62, 65-66, 296 S.E.2d 649, 651 (1982). "Whether the evidence presented constitutes substantial evidence is a question of law for the trial court." *State v. Sexton*, 336 N.C. 321, 361, 444 S.E.2d 879, 902, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 429 (1994). Evidence is deemed "substantial" if the evidence is "existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980). In reviewing

> "the sufficiency of circumstantial evidence, the question for the Court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty."

*Id.* (quoting *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965)). In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor. *State*

*v. Sumpter*, 318 N.C. 102, 107, 347 S.E.2d 396, 399 (1986). If the evidence "is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed." *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983).

The evidence showed that defendant lived about four-tenths of a mile from the victims' campsite. He had a motive to steal from the victims and kill them if discovered because he had escaped from jail and was hiding, stealing food and other supplies to survive. On 22 June 1990 he was seen walking toward the victims' campsite; the murders occurred on 22 or 23 June 1990. The victims were killed with a 16-gauge shotgun. A 16-gauge shotgun was found at defendant's campsite that had chambered and ejected shells that were found at the victims' campsite. A pair of boots whose tread was similar to an impression left all over the crime scene was also found there. The day after the murders defendant possessed many of the victims' goods, including a gold ring which had been worn by Richard Connor on his left ring finger. Richard's left ring finger had been severed. Finally, on 24 June 1990 witnesses saw defendant acting nervous and brandishing a pistol. Defendant stated that "he was ready for anything if anything went on like what went on last night." Defendant also said "ain't nobody going to f— me no more."

[7] This evidence clearly supports a reasonable inference—more than a mere suspicion or conjecture—that defendant was the perpetrator of the murders. Further, the killing of a victim and a defendant's recent possession of the victim's goods is sufficient evidence to support a verdict of guilty of robbery with a dangerous weapon. *See State v. Robbins*, 319 N.C. 465, 513, 356 S.E.2d 279, 307, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987). This assignment of error is overruled.

[8] Next, defendant argues the trial court erred in refusing to instruct on the lesser included offense of second-degree murder. He contends that because there was evidence that (1) a hunting knife was found under Larry Connor's body, (2) Larry was standing when shot, and (3) Larry and Richard Connor drank on camping trips, the jury could have inferred that defendant went to the camp, an altercation ensued between him and Larry, Larry grabbed his hunting knife, and defendant then shot Larry and Richard without premeditation or deliberation.

The trial court is not required to instruct on second-degree murder in every case in which it instructs on first-degree murder. *State v. Strickland*, 307 N.C. 274, 284-85, 298 S.E.2d 645, 653 (1983), *modified on other grounds by State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986). "[D]ue process requires only that a lesser offense instruction be given 'if the evidence would permit a jury rationally to find [defendant] guilty of the lesser offense and acquit him of the greater.' " *Id.* at 286, 298 S.E.2d at 654 (quoting *Beck v. Alabama*, 447 U.S. 625, 635, 65 L. Ed. 2d 392, 401 (1980)).

> The test in every case involving the propriety of an instruction on a lesser grade of an offense is not whether the jury could convict defendant of the lesser crime, but whether the State's evidence is positive as to each element of the crime charged and whether there is any conflicting evidence relating to any of these elements.

*State v. Leroux*, 326 N.C. 368, 378, 390 S.E.2d 314, 322, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990).

> First-degree murder is "the unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991). "Premeditation means that the act was thought out beforehand for some length of time, however short, but no particular amount of time is necessary for the mental process of premeditation." *State v. Conner*, 335 N.C. 618, 635, 440 S.E.2d 826, 835-36 (1994). "Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.* at 635, 440 S.E.2d at 836.

*State v. Skipper*, 337 N.C. 1, 26-27, 446 S.E.2d 252, 265-66 (1994). Premeditation and deliberation are not usually susceptible to direct proof; they can be inferred, however, from circumstances such as: "(1) want of provocation on the part of the deceased; (2) the conduct and statements of the defendant before and after the killing; . . . and (6) evidence that the killing was done in a brutal manner." *State v. Gladden*, 315 N.C. 398, 430-31, 340 S.E.2d 673, 693, *cert. denied*, 479 U.S. 870, 93 L. Ed. 2d 166 (1986).

The evidence here permitted a finding that defendant went to the victims' campsite, shot them at close range, and then stole their pos-

sessions. One of one victim's fingers was cut off, and a ring—later found in defendant's possession—was taken from his hand. Richard Connor was sitting down with a blanket or pillow on his chest when shot, indicating lack of provocation on his part. After the murders defendant was heard talking about how no one was going to "f— with him no more" and that "he was ready for anything if anything went on like what went on last night." There was also evidence that defendant had a motive for the killing—to obtain supplies and to stay hidden. This evidence cumulatively supports a finding of every element of first-degree, premeditated and deliberated murder. Further, there was no evidence—only conjecture—supporting defendant's theory that he shot the victims spontaneously during an altercation. The evidence showed that Richard was sitting in a chair when he was shot; there was no evidence he had been drinking. As the State's evidence was positive as to each element of first-degree murder, and there was no conflicting evidence, it was not error to refuse to instruct on the lesser included offense of second-degree murder.

[9] Defendant next contends the prosecutor denied him a fair trial by arguing that the jury should apply an unconstitutional definition of the reasonable doubt standard. He argues that the prosecutor's explanation of reasonable doubt allowed the jury to apply an unconstitutionally lenient standard of proof and violated due process. The prosecutor stated:

> I would like to start by focusing on some things that I think have become a critical issue for you in your deliberation. That is whether the State's evidence is sufficient to convince you beyond a reasonable doubt of [defendant's] guilt.

> Question is whether this evidence is sufficient to lead you to believe basically that he killed the Connor brothers. You have to understand there is no such thing as an absolute certainty, but there is a certainty sufficient for the purposes of human life. That is essentially what proof beyond a reasonable doubt means.

> You know that farmers till their fields every year in preparation to plant. They plant but they never know with a certainty that they will actually harvest their crops, but they do all of this year after year as they sufficiently believe that they will in fact harvest.

> What is required here, ladies and gentlemen, is not that you be convinced absolutely as to know the defendant's guilt. What is required [is] that you be convinced to the point of believing he is

guilty. The evidence must convince the twelve of you who have no personal knowledge to the point where you have enough knowledge to where you believe that he is guilty.

What you must do at this point is examine your beliefs. What you must do at this point is examine the evidence and weigh it, and weigh it against your conscience and when you do the State is convinced that you will be satisfied that Clinton Ray Rose, the defendant, murdered these victims.

Defendant notes that in *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339 (1990) (per curiam), the United States Supreme Court held that a reasonable doubt instruction which required the jury to have a "substantial doubt" or "grave uncertainty" suggested a higher degree of doubt than is required for acquittal, and that when these statements are considered with the phrase "moral certainty," rather than evidentiary certainty, a juror can find defendant guilty "based on a degree of proof below that required by the Due Process Clause." *Id.* at 41, 112 L. Ed. 2d at 342. He argues that the prosecutor's language— that it was sufficient if the jurors "believed basically" that defendant was guilty, and that they could find defendant guilty if their doubts were no greater than the substantial level of uncertainty confronted by farmers when they plant each year—allowed the jury to find him guilty based on a degree of proof below that which due process requires.

Defendant did not object to this argument. Thus, we consider only whether the argument was so grossly improper that it was a denial of due process for the trial court to fail to intervene *ex mero motu. State v. Zuniga*, 320 N.C. 233, 257, 357 S.E.2d 898, 914, *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987).

"[P]rosecutorial statements are not placed in an isolated vacuum on appeal." *State v. Pinch*, 306 N.C. 1, 24, 292 S.E.2d 203, 221, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson*, 336 N.C. 78, 443 S.E.2d 306 (1994). In viewing the argument in its entirety, it is clear that the prosecutor was indicating to the jurors that they did not have to have "absolute certainty" to find defendant guilty. This was not error. The jury does not have to be absolutely certain or totally free from doubt to find a defendant guilty. *See State v. Watson*, 294 N.C. 159, 166-67, 240 S.E.2d 440, 445-46 (1978) (instruction that reasonable doubt does not mean jurors

"must be satisfied beyond any doubt or all doubt" held proper). Instead, the jury must believe defendant is guilty beyond a reasonable doubt. A reasonable doubt may be an "honest, substantial misgiving," but it is not a "vain, imaginary or fanciful doubt." *State v. Hudson*, 331 N.C. 122, 141-43, 415 S.E.2d 732, 742-43 (1992), *cert. denied*, —— U.S. ——, 122 L. Ed. 2d 136, *reh'g denied*, —— U.S. ——, 122 L. Ed. 2d 776 (1993). The argument here did not lower the State's burden of proof in violation of defendant's due process rights.

Defendant notes that the United States Supreme Court and this Court have held that a jury instruction defining reasonable doubt which requires an improperly high degree of doubt for acquittal offends due process. *Cage v. Louisiana*, 498 U.S. 39, 112 L. Ed. 2d 339; *State v. Bryant*, 334 N.C. 333, 432 S.E.2d 291 (1993), *sentence vacated on other grounds*, —— U.S. ——, 128 L. Ed. 2d 42, *on remand*, 337 N.C. 298, 446 S.E.2d 71 (1994) (with a different result). *Cage* and *Bryant*, however, dealt with instructions the trial court gives to the jury. These cases "are not controlling here, where the statements complained of were made by the prosecutor during jury arguments." *State v. Jones*, 336 N.C. 490, 495, 445 S.E.2d 23, 25 (1994).

Prior to closing arguments, the court instructed the jury: "It is now the time for the final arguments of the attorneys. At the conclusion of the arguments I will then instruct you on the law in this State and you may go to the jury room at that time and begin your deliberations." During jury instructions the trial court properly instructed as to "reasonable doubt." It instructed that

[a] reasonable doubt is a doubt based on reason and common sense, arising out of some or all of the evidence that has been presented, or lack or insufficiency of the evidence as the case may be. Proof beyond a reasonable doubt is proof that fully satisfies or entirely convinces you of the defendant's guilt.

This correct instruction, which followed the complained-of statement by the prosecutor, remedied the error, if any, in the prosecutor's closing argument. "In this context, any error of the prosecutor in defining the term reasonable doubt could not have denied the defendant due process and did not require a new trial." *State v. Jones*, 336 N.C. at 496, 445 S.E.2d at 26; *see also State v. Anderson*, 322 N.C. 22, 38, 366 S.E.2d 459, 469 (any misstatements of law in prosecutor's closing argument cured by trial court's proper instructions), *cert. denied*, 488 U.S. 975, 102 L. Ed. 2d 548 (1988); *State v. Gladden*, 315 N.C. at 426, 340 S.E.2d at 690-91 (same). This assignment of error is overruled.

SENTENCING PHASE

**[10]**  Defendant argues that the trial court erred in submitting both the "course of conduct" and "prior violent felony" aggravating circumstances. The court instructed as to the "course of conduct" circumstance as to Richard Connor's murder as follows:

> The third aggravating circumstance that the State alleges and has the burden of proving beyond a reasonable doubt [is], "was this murder a part of a course of conduct in which the defendant engaged and did that course of conduct include the commission by the defendant of other crimes of violence against other persons."
>
> A murder is part of such a course of conduct if it, and the other crimes of violence are part of a pattern of the same or similar acts which establish that there existed in the mind of the defendant a plan, scheme, system or design involving both the murder and those other crimes of violence. If you find from the evidence beyond a reasonable doubt that in addition to killing the victim, Richard Dean Conn[o]r, the defendant on or about the alleged date was engaged in a course of conduct which involved the commission of another crime of violence against another person and that this crime was included in the same course of conduct in which the killing of the victim, Richard Dean Conn[o]r, was also a part, you find this aggravating circumstance and would so indicate by having your foreperson write, "Yes," in the space after this aggravating circumstance on the "Issues and Recommendation" form.

It gave the same instructions for this aggravating circumstance as to Larry Connor's murder. Defendant argues that the court failed to specify what the jury should consider as "other crimes of violence," and the jury thus could have considered the Alabama murder and Oregon kidnapping as part of the course of conduct in the murders here. This error was magnified, he says, by the prosecutor's pointing out that both the Alabama murder victim and Larry Connor had been shot in the head above the right eye and that defendant had stolen from both of these victims. Because the Alabama incident supported the "prior violent felony" aggravating circumstance, it could not be used to support a second aggravating circumstance.

In *State v. Gay*, 334 N.C. 467, 434 S.E.2d 840 (1993), we stated that "where there is separate evidence to support each aggravating cir-

cumstance, it is not improper for both of the circumstances to be submitted." *Id.* at 495, 434 S.E.2d at 856. There was separate evidence here to support both a finding that defendant had been previously convicted of a violent felony and the finding that the murders of Richard and Larry Connor were part of a course of violent conduct. The evidence of the murder of the Alabama victim supported the finding of prior conviction of a violent felony. The murder of Richard Connor supported the finding of a course of violent conduct in the sentencing for the murder of Larry Connor, while the murder of Larry Connor supported the finding of a course of violent conduct in the sentencing for the murder of Richard Connor. The instructions directed the jury to consider whether defendant was involved in a course of violent conduct "on or about the alleged date" of the murders of Larry and Richard Connor. Defendant argues that the phrase " 'on or about the alleged date' is so ambiguous as to be incomprehensible." We disagree. Considering the instructions in their entirety and in context, we conclude that the jury could not have interpreted them to mean that the murder of the Alabama victim could be considered as part of a course of violent conduct that included the much later murders of the victims here.

[11] Defendant contends the trial court did not ensure that the jury did not use the same evidence to support both aggravating circumstances. In *State v. Jennings*, 333 N.C. 579, 628, 430 S.E.2d 188, 214, *cert. denied,* —— U.S. ——, 126 L. Ed. 2d 602 (1993), we noted that "the trial court should have instructed the jury that it could not use the same evidence as the basis for finding both circumstances." *See also State v. Gay,* 334 N.C. at 495, 434 S.E.2d at 856. We went on to note, however, that the defendant had not objected to the trial court's failure to instruct the jury not to use the same evidence to support both circumstances, and stated: "We do not believe the failure to so instruct had a probable impact on the jury's finding of these circumstances; we thus decline to find plain error in the failure to so instruct." *State v. Jennings,* 333 N.C. at 628, 430 S.E.2d at 214. Here, too, defendant did not ask the trial court to instruct the jury that it could not use the same evidence to support both aggravating circumstances. We again conclude that this failure did not have a "probable impact" on the jury's finding of these circumstances and was not plain error.

[12] Defendant next argues the trial court erred in admitting the testimony of Lynn Enyard regarding the circumstances of defendant's convictions for the murder of Gary Fidslar and the second-degree kid-

STATE v. ROSE

[339 N.C. 172 (1994)]

napping of Michael O'Malley. Enyard was a Special Agent for the Federal Bureau of Investigation. He questioned O'Malley and defendant on 26 October 1973 after the two had been arrested for firing shots in the downtown area of Eugene, Oregon. O'Malley claimed that defendant had abducted him. He stated that he had held defendant at bay by pretending he was planning a robbery and asking defendant if he wanted to be involved. Defendant was convicted of the second-degree kidnapping of O'Malley.

When first questioned by police in Oregon, defendant identified himself as Gary Fidslar. Enyard learned that Fidslar had been reported missing in Tennessee. Defendant then told Enyard he was not Fidslar but knew Fidslar because he had helped him with a drug deal that had gone bad. Defendant told Enyard that Fidslar had given defendant his money, wallet, and identification and told defendant to travel west to get away from the drug dealers who were after them. Fidslar's body was eventually found in Alabama; he had been killed by a .38-caliber gunshot to his right forehead.

Our capital sentencing statute provides, in conformity with the constitutional mandates of the Eighth and Fourteenth Amendments, "that any evidence may be presented at the separate sentencing hearing *which the court deems* 'relevant to sentence' or 'to have probative value,' including matters related to aggravating or mitigating circumstances." *State v. Pinch,* 306 N.C. at 19, 292 S.E.2d at 219, *overruled on other grounds by State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988), *and by State v. Robinson,* 336 N.C. 78, 443 S.E.2d 306 (1994) (quoting N.C.G.S. § 15A-2000(a)(3) (1994)). "[T]he ultimate issue concerning the admissibility of . . . evidence must still be decided by the presiding trial judge, and his decision is guided by the usual rules which exclude repetitive or unreliable evidence or that lacking an adequate foundation." *Id.*

> Evidentiary flexibility is encouraged in the serious and individualized process of life or death sentencing. *See Williams v. New York,* 337 U.S. 241, . . . 93 L. Ed. 1337 (1949). However, as in any proceeding, evidence offered at sentencing must be pertinent and dependable, and, if it passes this test in the first instance, it should not ordinarily be excluded.

*Id.* at 19 n.9, 292 S.E.2d at 219 n.9.

The United States Supreme Court has noted that "the sentencing authority has always been free to consider a wide range of relevant

material." *Payne v. Tennessee*, 501 U.S. 808, 820-21, 115 L. Ed. 2d 720, 732 (1991). A capital trial will satisfy the requirements of the Eighth Amendment if it (1) narrows the decisionmaker's judgment as to the circumstances under which to impose the death penalty, and (2) does not limit the consideration of relevant mitigating information. *Id.* at 824, 115 L. Ed. 2d at 734-35. Beyond these limitations, the states have latitude to prescribe the method by which those who commit murder should be punished. *Id.* at 824, 115 L. Ed. 2d at 735.

Defendant argues that the evidence was not admissible under these guidelines because it constituted inadmissible hearsay or because it was offered to show bad character when he had not presented evidence of his good character. In *State v. Brown*, 315 N.C. 40, 337 S.E.2d 808 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988), the Court noted that the "prosecution must be permitted to present *any* competent, relevant evidence relating to the defendant's character or record which will substantially support the imposition of the death penalty so as to avoid [its] arbitrary or erratic imposition." *Id.* at 61, 337 S.E.2d at 824. This contention is without merit.

Defendant also argues that because the State had offered certified copies of court documents to establish that he had been convicted of felonies involving the threat or use of violence against a person, it should not have been allowed to introduce additional testimony about the circumstances of the felonies. The "better rule[, however,] is to allow both sides to introduce evidence in support of aggravating and mitigating circumstances which have been admitted into evidence by stipulation." *State v. Taylor*, 304 N.C. 249, 279, 283 S.E.2d 761, 780 (1981), *cert. denied*, 463 U.S. 1213, 77 L. Ed. 2d 1398, *reh'g denied*, 463 U.S. 1249, 77 L. Ed. 2d 1456 (1983); *see also State v. McDougall*, 308 N.C. 1, 22-23, 301 S.E.2d 308, 321, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 173 (1983). The United States Supreme Court has also supported an inclusion of evidence before a sentencer, noting that "where sentencing discretion is granted, it generally has been agreed that the sentencing judge's 'possession of the fullest information possible concerning the defendant's life and characteristics' is '[h]ighly relevant—*if not essential*—[to the] selection of an appropriate sentence.'" *Lockett v. Ohio*, 438 U.S. 586, 602-03, 57 L. Ed. 2d 973, 988-89 (1978) (quoting *Williams v. New York*, 337 U.S. 241, 247, 93 L. Ed. 2d 1337, 1342 (1949)). We conclude that the trial court correct-

ly admitted the evidence about the circumstances surrounding the murder of Gary Fidslar in Alabama.

Finally, with regard to the evidence surrounding the kidnapping, defendant argues that the statements by the victim to Enyard constituted inadmissible hearsay and should not have been admitted, citing *State v. McLaughlin*, 316 N.C. 175, 340 S.E.2d 102 (1986). *McLaughlin*, which involved the admission of an accomplice's confession during the guilt phase of a rape trial, is not pertinent. *State v. Roper*, 328 N.C. 337, 402 S.E.2d 600, *cert. denied*, —— U.S. ——, 116 L. Ed. 2d 232 (1991), is more on point.

In *Roper* an S.B.I. agent, who had investigated a prior felony of which defendant had been convicted, was allowed to testify that while the victim of the prior violent felony was begging for his life defendant stated that if the victim did not die he would shoot him again. *Id.* at 364, 402 S.E.2d at 615. The statement had been related to the agent by an unidentified declarant while the agent was investigating the prior killing for which defendant was convicted. *Id.* The defendant there argued that this statement was inadmissible hearsay; this Court held that the evidence was relevant to sentencing and was admissible to aid the sentencer. *Id.* at 364, 402 S.E.2d at 615-16.

We conclude here, similarly, that the circumstances surrounding the kidnapping in Oregon, as relayed by the victim to an investigating officer, were relevant to sentencing and admissible to aid the sentencer. The trial court correctly admitted evidence of the circumstances of the prior murder and kidnapping to support the aggravating circumstance that defendant had been convicted of a prior violent felony. This assignment of error is overruled.

Next, defendant argues the trial court erred when it failed to intervene *ex mero motu* during the prosecutor's closing argument. Specifically, he argues that he was prejudiced by statements indicating that if given a life sentence he might again escape and kill, and by biblical references. As there was no objection, defendant must establish that the impropriety was so gross that the trial court abused its discretion in not correcting the arguments *ex mero motu. State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979). To establish an abuse of discretion, defendant must show that the prosecutor's comments " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 437 (1974)).

**[13]** First, defendant argues that the prosecutor erred when he argued:

> The people of the State of Alabama thought they put him into prison for the rest of his life but he walked away. And he believes that is all that will happen to him.
>
> Now he is eligible for a life sentence. He would go back to prison. Work like he did in Alabama and he will go on and on until he gets to a point where he can escape again. Gets tired of it again. He can escape and somebody else then is going to die.

Defendant contends this statement was analogous to a prosecutor arguing about parole, which was held impermissible in *State v. Jones*, 296 N.C. 495, 502, 251 S.E.2d 425, 429 (1979).

Trial counsel are allowed wide latitude in jury arguments. *State v. Soyars*, 332 N.C. 47, 60, 418 S.E.2d 480, 487 (1992). They are entitled to argue the law, the facts, and all reasonable inferences therefrom. *State v. Huffstetler*, 312 N.C. 92, 112, 322 S.E.2d 110, 123 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985). Here, defendant had escaped from jail in the past after being sentenced to life imprisonment. This was a fact in evidence that the prosecutor could mention. He was not addressing parole but defendant's potential future dangerousness if he again received a life sentence. We have held such specific deterrence arguments permissible in capital cases. *State v. Laws*, 325 N.C. 81, 120, 381 S.E.2d 609, 632 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 328 N.C. 550, 402 S.E.2d 573, *cert. denied*, —— U.S. ——, 116 L. Ed. 2d 174, *reh'g denied*, —— U.S. ——, 116 L. Ed. 2d 648 (1991); *State v. Zuniga*, 320 N.C. at 269, 357 S.E.2d at 920. This argument is without merit.

**[14]** Defendant also contends the prosecutor's argument that the Bible states that those who have committed murder should be punished with death was prejudicial. He asks us to adopt the holding of the Pennsylvania Supreme Court and conclude that biblical arguments are *per se* reversible error. *See Commonwealth v. Chambers*, 528 Pa. 558, 599 A.2d 630 (1991), *cert. denied*, —— U.S. ——, 119 L. Ed. 2d 214, *reh'g denied*, —— U.S. ——, 120 L. Ed. 2d 937 (1992). We instead continue to follow our own precedents.

This Court has held "more often than not" that biblical arguments "fall within the permissible margins" allowed counsel arguing "hotly contested cases." *State v. Artis*, 325 N.C. 278, 331, 384 S.E.2d 470, 500

(1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604, *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). Prosecutors have read passages similar to those read here, and we have held that this was not so grossly improper as to require *ex mero motu* intervention. *See State v. Artis*, 325 N.C. at 330, 384 S.E.2d at 500; *State v. Fullwood*, 323 N.C. 371, 398-99, 373 S.E.2d 518, 534-35 (1988), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991). We hold that the quotations at issue here, like the similar ones in *Artis* and *Fullwood*, were not so grossly improper as to require the trial court to intervene *ex mero motu*.

Defendant also argues that the cumulative effect of the specific deterrence arguments and references to Bible verses was prejudicial. Neither was grossly improper standing alone, and we cannot hold that their cumulative effect was prejudicial. This assignment of error is overruled.

[15] Defendant's final argument is that he is entitled to a new capital sentencing proceeding because the jury did not clearly pass on the existence of all mitigating circumstances submitted. The issues and recommendations forms indicated that at least one juror believed mitigating circumstance number five—that defendant's background at the time of the offense was influenced or possibly influenced by the fact that he had been incarcerated since October 1973—existed and had mitigating value in both murders. After the jury turned in the verdict sheets, the trial court asked the foreman: "You have indicated on the verdict form that you have found mitigating circumstance one, two, three, and you did not find mitigating factor, or circumstance, four, and you did not find mitigating circumstance five, and did not find mitigating circumstance six." The foreman replied: "Yes, Your Honor." Defendant argues that because the written sheets indicate that the jury did find mitigating circumstance five, but the foreman's answer indicates that mitigating circumstance number five was rejected, the jury must not have considered it, and this violates the Eighth Amendment. Defendant notes his right to have the jury consider any mitigating evidence. *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990).

While a defendant has the right to have a jury consider and give effect to any mitigating evidence, the statement in question does not establish that the jury did not consider the mitigating circumstance. The jury was instructed as to this circumstance, and the circumstance

was set forth and responded to on the written sheet carried into deliberations. The record thus clearly indicates that the jury considered this circumstance. This assignment of error is overruled.

PROPORTIONALITY REVIEW

**[16]** Neither defendant nor the State argues proportionality. Nevertheless,

> [h]aving found defendant's trial and capital sentencing proceeding free of prejudicial error, we are required by statute to review the record and determine whether (i) the record supports the existence of the aggravating circumstances on which the court based its sentence of death, (ii) the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and defendant.

*State v. Sexton*, 336 N.C. at 376, 444 S.E.2d at 910.

The jury found the existence of the same three aggravating circumstances as to each murder: (1) that defendant had been previously convicted of a felony involving the use of violence to a person, N.C.G.S. § 15A-2000(e)(3); (2) that the murder was committed while defendant was engaged in the commission of robbery with a firearm, N.C.G.S. § 15A-2000(e)(5); and (3) that the murder was part of a course of conduct in which defendant engaged, which included defendant's commission of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11). We have noted above that evidence supported the jury's finding of the first and third aggravating circumstances. The record also supports the jury's finding that the murders were committed while defendant was engaged in the commission of an armed robbery. Nothing in the record indicates that the jury's decision to impose the death sentence was influenced by passion, prejudice or any other arbitrary factor. We thus consider "whether the death sentence[s] . . . [are] excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *State v. Brown*, 315 N.C. at 70, 337 S.E.2d at 829.

This Court has determined death sentences to be disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312

N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). In only two of these, *Bondurant* and *Rogers*, did the jury find the existence of the course of conduct aggravating circumstance. In *Bondurant* the Court noted that the defendant had shown concern for the victim's life, and remorse, by getting the victim to the hospital and going into the hospital to seek medical assistance for him. *State v. Bondurant*, 309 N.C. at 694, 309 S.E.2d at 182. In *Rogers* the course of conduct aggravating circumstance was the only one submitted, and the course of conduct did not involve a second murder. *State v. Rogers*, 316 N.C. at 234, 341 S.E.2d at 731. Defendant here did not assist his victims, and the course of conduct here involved two murders, not one. We have never held a death sentence disproportionate in a case involving multiple murders.

Defendant here had escaped from a minimum security prison while serving a life sentence for a previous murder. While on escape he murdered Richard and Larry Connor by shooting them at close range, stole many of their possessions, and even cut off one victim's finger in order to steal a ring. No statutory mitigators were presented to the jury. The jury found the following nonstatutory mitigators in both cases: (1) defendant was an honor grade prisoner in Alabama, (2) defendant has a talent as an artist, (3) defendant did not attempt to elude sheriff's deputies when they came to his camp, and (4) defendant's background at the time of the offense was influenced or possibly influenced by the fact that he had been incarcerated since October 1973.

In *State v. Williams*, 305 N.C. 656, 292 S.E.2d 243, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), the defendant robbed two convenience stores in one night, shooting clerks in both at close range. The only aggravating circumstance found was that the defendant was engaged in a course of violent conduct. The jury found two statutory and four nonstatutory mitigating circumstances. We concluded that the death sentence was not disproportionate. In *State v. Gardner*, 311 N.C. 489, 319 S.E.2d 591, the defendant committed a double murder and stole money from the victims' employer. The jury found two aggravating circumstances—one being the course of conduct circumstance present in this case—and two nonstatutory mitigating circumstances. The Court determined that the death sentence was not disproportionate. *Id.* at 514-15, 319 S.E.2d at 607. We have found the death penalty not

disproportionate in other cases with similar facts or similar aggravating circumstances. *See State v. Vereen*, 312 N.C. 499, 504-05, 517-19, \ 324 S.E.2d 250, 254-55, 262-63 (same three aggravating circumstances found), *cert. denied*, 471 U.S. 1094, 85 L. Ed. 2d 526 (1985); *State v. Lawson*, 310 N.C. 632, 314 S.E.2d 493 (1984) (defendant killed and robbed one victim and injured another when he was discovered robbing the home of one of the victims), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). We find these to be the cases in the proportionality pool most similar to this case.

Finally, we note that the "issue of whether the death penalty is proportionate in a particular case must rest in part on the experienced judgment of the members of this Court, not simply on a mere numerical comparison of aggravators, mitigators, and other circumstances." *State v. Skipper*, 337 N.C. at 64, 446 S.E.2d at 287. This case involves a defendant who had previously been convicted of first-degree murder and second-degree kidnapping. He escaped from prison and proceeded to murder again—this time killing two people by shooting them at close range. He then stole their possessions. Based on our review of the cases in the pool and the "experienced judgment" of the members of this Court, we cannot hold as a matter of law that the death sentences here are disproportionate.

We conclude that defendant received a fair trial and sentencing proceeding, free of prejudicial error, before an impartial judge and jury. The evidence supports the convictions and the aggravating circumstances found; the death sentences were not imposed under the influence of passion, prejudice or any other arbitrary factor; and they are not disproportionate.

NO ERROR.