IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-552

Filed: 3 March 2020

Orange County, Nos. 16 CRS 711684, 711720, 711721; 17 CRS 78, 79

STATE OF NORTH CAROLINA

v.

MICHAEL ADDIB NAZZAL, Defendant.

Appeal by defendant from judgments entered 22 February 2018 by Judge Rebecca W. Holt in Orange County Superior Court. Heard in the Court of Appeals 5 February 2020.

*Attorney General Joshua H. Stein, by Assistant Attorney General Kathryne E. Hathcock, for the State.*

*M. Gordon Widenhouse, Jr., for defendant.*

ARROWOOD, Judge.

Michael Addib Nazzal ("defendant") appeals from judgments sentencing him upon his convictions for second-degree murder, driving while impaired ("DWI"), felony death by motor vehicle, and failure to maintain lane control. For the following reasons, we reverse defendant's convictions for DWI and felony death by motor vehicle. We otherwise hold that defendant's trial was free of prejudicial error.

I.      Background

This case arises from an automobile collision caused by defendant on Interstate 40 West ("I-40 West") resulting in the death of Francisco Nolasco ("Mr. Nolasco"). As a result of this collision, defendant was indicted on 15 May 2017 for felony hit and run causing death, driving while license revoked ("DWLR"), DWLR for impaired driving, displaying revoked tags, operating a vehicle without insurance, failing to maintain lane control, DWI, felony death by motor vehicle, and second-degree murder. Defendant's case came on for trial before the Honorable Rebecca W. Holt at the 12 February 2018 Criminal Session of Orange County Superior Court. The evidence at trial tended to show the following.

Just before 2:00 a.m. on 17 December 2016, Mr. Nolasco's pickup truck was involved in a single-vehicle accident requiring assistance on I-40 West in Orange County. Road conditions that night were wet and icy. Mr. Nolasco called his friend and tow truck driver Omar Castillo ("Mr. Castillo") for assistance, and he arrived shortly thereafter. Upon realizing that Mr. Nolasco's pickup was precariously positioned partially in the right lane of traffic, Mr. Castillo immediately set about removing the vehicle from the road.

Mr. Castillo testified that he then positioned his tow truck in front of Mr. Nolasco's pickup, partially in the right lane of traffic. For unknown reasons, the tow truck's cable system failed to lift the pickup onto its rollback. At this time, Mr. Nolasco was standing on the shoulder of the road, with the tow truck between himself

and the westbound lanes of traffic. Mr. Castillo began walking around the front of the tow truck to address the cable system malfunction. As he was in front of the tow truck, he heard screeching tires, dove over the guardrail, and observed a black Honda crash into the guardrail and hurdle forward, hitting the pickup and tow truck before proceeding down the shoulder between the tow truck and guardrail, hitting Mr. Nolasco and knocking him into the road.

Mr. Castillo testified that he went into the road to assist Mr. Nolasco and found him unconscious. He tried to signal oncoming cars but they did not see him, and he had to leave Mr. Nolasco in the road to preserve his own safety. Then another car traveling about forty seconds behind defendant ran over Mr. Nolasco. Based on his observation of the collision's intensity and Mr. Nolasco's unconscious body in the roadway, Mr. Castillo opined that defendant's black Honda killed him before the second car arrived. He testified that the second car stopped immediately after hitting Mr. Nolasco, but defendant only stopped briefly and then continued.

Austin Phillips ("Mr. Phillips"), the driver of the second car, testified that he saw the tow truck's flashing lights and switched from the right to left lane of westbound traffic in order to "avoid any contact with the person that may be getting out of the tow truck[.]" After realizing he had run over a human body, Mr. Phillips immediately pulled over and called 911 for assistance.

Trooper Kyle Underwood testified that he, Trooper Matthew Morrison, and one other highway patrolman arrived at the scene at 1:54 a.m. and began taking measurements, recording witness statements, and investigating the wreckage and other evidence at the scene. Trooper Underwood noted damage to the shoulder's guardrail at a position prior to the tow truck, damage to Mr. Nolasco's pickup, and a missing passenger side mirror on the tow truck. He discovered the front bumper of a black Honda 99 feet away.

After searching the serial number on the bumper, the troopers discovered that it belonged to a 2010 Honda Accord registered to defendant's name at a Greensboro address. They also determined that defendant's tags and registration were currently revoked due to a failure to carry insurance and his driver's license was currently suspended for a previous DWI conviction. The troopers then contacted the Guilford County Sheriff's Office for assistance locating defendant.

Sergeant James Meacham and Master Corporal Todd Riddle of the Guilford County Sheriff's Office arrived at defendant's Greensboro address just after 4:00 a.m. Thirty minutes later, defendant arrived in a black Honda Accord with significant front-end damage. This damage included deployed airbags, no front bumper, a shattered windshield, damage to the hood, missing headlights, and general body damage on the front of the car. Sergeant Meacham called Trooper Morrison and informed him that they had detained defendant at his residence. In his conversation

with the deputies, defendant admitted that he had been involved in a collision but said "it wasn't a very bad one[,]" so he drove away. Sergeant Meacham testified that "[defendant's] actions indicated just a very carefreeness [sic] attitude about what had transpired[.]" The two deputies were relieved by deputies on the day shift at around 6:00 a.m.

Troopers Underwood and Morrison obtained an arrest warrant for felony hit and run and arrived at defendant's residence in Greensboro at around 7:00 a.m. Trooper Morrison observed that defendant's car was covered in droplets of ice and appeared to be much cleaner than his own patrol vehicle covered in road salt, despite both cars making a similar drive from Orange County to Greensboro in identical weather conditions. Defendant was arrested and transported by the troopers to the Orange County Sheriff's Office for booking. Two cell phones found on defendant's person at the time of his arrest were seized.

Based upon his observations of defendant while they were en route to the sheriff's office, Trooper Underwood testified that he formed an opinion that defendant was appreciably impaired to the extent that it was unsafe for him to drive an automobile at the time of the collision five hours earlier. In addition to the mere nature of the collision site and his flight therefrom, Trooper Underwood based this opinion on the following evidence. When he observed defendant at approximately 7:00 a.m., defendant had red, glassy eyes, was unsteady on his feet, and at times was

"speaking out of his head" and "rambling, going on with half sentences, speaking [in a way] that just did not make sense." Defendant also made contradictory statements regarding his location at the time of the collision, seeming confused about where it occurred. Additionally, defendant fell asleep on the ride to the sheriff's office. Trooper Underwood found this very strange because defendant had just been told the jarring news that he had killed a man. He stopped his patrol vehicle and had Trooper Morrison shake defendant awake, upon which defendant stated that he was fine. No other testifying officer formed the opinion that defendant was impaired at the time of the collision. Nor did any investigating officer ever subject defendant to any of the numerous field tests for impairment utilized by law enforcement.

A later search of defendant's phones revealed text messages tending to suggest he had been attempting to buy crack cocaine earlier in the day before the collision. The search also led the State to two testifying witnesses. Tiffany Haynes ("Ms. Haynes") testified that defendant called her for a "date" the day of the collision, stating that he would drive from Cary to her motel room in Greensboro that night. Because they had done the same thing on a previous "date" three weeks prior, Ms. Haynes believed that defendant intended to smoke crack with her, engage her in sexual intercourse, and then smoke marijuana. Robert Tate testified that defendant had bought an ounce of high-grade marijuana from him the day before the collision.

Defendant moved to dismiss the charges against him at the close of the State's evidence. The trial court denied the motions. The jury returned verdicts finding defendant guilty of DWLR, DWLR for impaired driving, displaying revoked tags, operating a vehicle without insurance, failing to maintain lane control, DWI, felonious hit and run causing injury, felony death by motor vehicle, and second-degree murder. The trial court arrested judgment on defendant's convictions for DWI and felony death by motor vehicle. The court consolidated judgment on defendant's remaining convictions and sentenced him to 175 to 222 months' imprisonment. Defendant timely appealed.

## II.    Discussion

On appeal, defendant argues that the trial court erred by: (a) denying his motions to dismiss the charges of second-degree murder, DWI, felony death by motor vehicle, and failure to maintain lane control; (b) denying his motion to suppress evidence obtained from a search of his cell phones; (c) admitting prejudicial testimony of prior drug use; and (d) refusing to instruct the jury on the defense of accident. For the foregoing reasons, we reverse defendant's convictions for DWI and felony death by vehicle and otherwise hold his trial was free of prejudicial error.

## A.    Motions to Dismiss

Defendant argues that substantial evidence did not support his convictions for DWI, felony death by vehicle, and failure to maintain lane control, and thus the trial

court erred in denying his motion to dismiss those charges. He further contends that the trial court erred in denying his motion to dismiss his second-degree murder charge, because the jury was instructed that defendant would need to be found guilty of either DWI or failure to maintain lane control to be guilty of second-degree murder.

We hold that the trial court erred in denying defendant's motion to dismiss the DWI and felony death by vehicle charges due to insufficient evidence of impairment. The trial court properly submitted the failure to maintain lane control charge to the jury. Substantial evidence supported the element of malice in defendant's commission of this offense, therefore the trial court did not err in submitting the second-degree murder charge to the jury.

1. Standard of Review

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007) (citation omitted). " 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.' " *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (quoting *State v. Barnes*, 334 N.C. 67, 75, 430 S.E.2d 914, 918 (1993)), *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994) (citation omitted), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995). "The trial court is not required to determine that the evidence excludes every reasonable hypothesis of innocence before denying a defendant's motion to dismiss." *State v. Barfield*, 127 N.C. App. 399, 401, 489 S.E.2d 905, 907 (1997) (citation omitted).

## 2. DWI and Felony Death by Vehicle

Defendant maintains that the trial court erred in denying his motions to dismiss the charges of DWI and felony death by vehicle because the State presented insufficient evidence that he was appreciably impaired at the time he caused the collision and hit Mr. Nolasco. We agree.

"A person commits the offense of impaired driving if he drives any vehicle upon any highway, any street, or any public vehicular area within this State . . . [w]hile under the influence of an impairing substance . . . ." N.C. Gen. Stat. § 20-138.1(a)(1) (2019). The person must "hav[e] his physical or mental faculties, or both, appreciably impaired by an impairing substance." N.C. Gen. Stat. § 20-4.01(48b) (2019).

We find our opinion in *State v. Eldred* to be instructive in the instant case. 259 N.C. App. 345, 815 S.E.2d 742 (2018). In *Eldred*, officers got a report of a wrecked, abandoned car on the roadside at 8:30 p.m. *Id.* at 346, 815 S.E.2d at 743. Though he did not testify how soon after the report the interaction occurred, an officer observed the defendant walking along the roadside approximately two to three miles from the car. *Id.* The defendant had visible head injuries, stated that he was "smoked up on meth" and needed medical attention, and exhibited signs of impairment such as twitching and having difficulty walking straight. *Id.* at 346-47, 815 S.E.2d at 743 The defendant was then taken to the hospital, where a highway patrolman observed him at 9:55 p.m. *Id.* at 346, 815 S.E.2d at 743. He told the patrolman that he had been driving his car and set out on foot when it ran out of gas, later indicated that he had been hurt in a car wreck "a couple of hours ago[,]" and stated that he was currently "on meth." *Id.* at 347, 815 S.E.2d at 743 (internal quotation marks omitted). After observing the defendant exhibit numerous signs of impairment at the hospital, the patrolman formed the opinion that the defendant was appreciably impaired. *Id.*

This Court held this evidence insufficient to prove that the defendant was appreciably impaired at the time he wrecked his car. It observed that:

> [The first officer], who first found Defendant after he had walked two or three miles beyond his vehicle, did not determine whether Defendant's condition was caused by an impairing substance or by the injury that resulted in emergency medical personnel taking Defendant to the hospital. [The patrolman], who interviewed Defendant in

> the hospital, did not obtain information concerning when or where Defendant had consumed meth or any other impairing substance. Neither officer even knew when Defendant's vehicle had veered off the highway.

*Id.* at 350, 815 S.E.2d at 745.

In the instant case, Trooper Underwood formed his opinion of impairment entirely through passive observation of defendant. He did not request defendant to perform any of the several field tests law enforcement officers often use to gauge a motorist's impairment. Moreover, as in *Eldred*, he did not ask defendant if or when he had ingested any impairing substances. Trooper Underwood was the only law enforcement officer that observed defendant and formed an opinion that he was appreciably impaired. These observations occurred at 6:48 a.m., approximately five hours after the collision occurred. This lapse of time is over three times longer than the one that was found unacceptable in *Eldred*.

The State argues that the signs of impairment observed by Trooper Underwood five hours later, when coupled with the very nature of the collision, defendant's immediate flight from the scene, and his gross understatement of the collision's severity, provide substantial evidence that defendant was appreciably impaired at the time of the collision. We disagree. Hit and run and DWI are separate offenses for a reason. Without more, the former cannot suffice as substantial evidence of the latter. Furthermore, defendant's understatement of the collision's severity can more readily be interpreted as downplaying his culpability than an impaired perception of

events. Again, without more this cannot suffice as substantial evidence of appreciable impairment at the time of the collision. There must be some evidence closer to that time which more than circumstantially implies that defendant was impaired. *See State v. Rich*, 351 N.C. 386, 398-99, 527 S.E.2d 299, 305-306 (2000) (upholding trial court's admission of officer opinion of appreciable impairment based upon investigation of accident scene, defendant's high rate of speed, observation of defendant's combative behavior with EMS at scene and bloodshot, watery eyes shortly after wreck, no indication of injuries to defendant, and smell of alcohol observed at hospital two hours later).

Therefore, the trial court erred in denying defendant's motion to dismiss the DWI charge. The trial court also erred in denying defendant's motion to dismiss the felony death by motor vehicle charge, because DWI is a necessary element of this offense. *See* N.C. Gen. Stat. § 20-141.4(a1)(2) (2019). Since the trial court arrested judgment on both convictions, we reverse them without remand.

### 3.    Failure to Maintain Lane Control

Defendant argues that the State failed to present substantial evidence that he violated N.C. Gen. Stat. § 20-146(d)(1) (2019) by veering to the right of Mr. Castillo's tow truck and attempting to pass it on the shoulder of the road. We disagree.

"Whenever any street has been divided into two or more clearly marked lanes for traffic . . . [a] vehicle shall be driven as nearly as practicable entirely within a

single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." *Id.* Defendant argues that because the evidence showed that Mr. Castillo's tow truck partially obstructed the right lane in which he was traveling, it was not "practicable" for him to drive entirely within that lane of traffic.

According to defendant, the offense has not been committed if a motorist recklessly veers out of his lane when it is no longer practicable to remain there due to an upcoming obstruction. In other words, defendant interprets the statute such that impracticability is an absolute defense. Although defendant's Memorandum of Additional Authority includes N.C.P.I. Crim. 207.90 (2019), which he argues supports this interpretation, we note that on appeal defendant has not challenged any of the trial court's jury instructions omitting the practicability element from the offense.

We do not interpret N.C. Gen. Stat. § 20-146(d)(1) to apply only to situations where it is practicable for a motorist to stay within his current lane of traffic. Rather, this provision contains two disjunctive mandates. A motorist must drive his vehicle "as nearly as practicable entirely within a single lane[.]" *Id.* A motorist must also refrain from changing lanes unless he "has first ascertained that such movement can be made with safety." *Id.*

Here, there was substantial evidence from which the jury could infer that defendant did not ascertain that veering onto the shoulder and passing the tow truck

on its right side could be done with safety. Viewing the evidence in a light most favorable to the State, defendant was driving late at night at a speed unreasonably fast for the icy conditions. Upon seeing Mr. Castillo's tow truck partially obstructing his current lane of traffic, defendant decided to pass the vehicle on the shoulder without first determining what, if any, further perils lay in his redirected course. The tow truck obstructed his view of at least some portion of the shoulder through which he would soon drive. As evidenced by the testimony of Mr. Phillips, a reasonable motorist would not have attempted to pass the tow truck to its right along the shoulder. A motorist traveling 40 seconds behind defendant ascertained that passing the tow truck on the shoulder-side could not be done with safety. From this evidence a reasonable juror could find that defendant did not make such a determination before conducting his maneuver.

Even under defendant's interpretation of N.C. Gen. Stat. § 20-146(d)(1), there was substantial evidence on each side of the practicability issue from which the jury could make its own determination. In negligence *per se* cases interpreting N.C. Gen. Stat. § 20-146(d)(1), we have previously held that where a plaintiff puts forth evidence that the defendant crossed the center line into oncoming traffic and the defendant puts forth evidence that it was impracticable to stay within his lane "for reasons other than his own negligence," the conflicting evidence "merely . . . raise[s] an issue of credibility for the jury to resolve." *Sessoms v. Roberson*, 47 N.C. App. 573, 579, 268

S.E.2d 24, 28 (1980) (citations omitted). Mr. Castillo testified that road conditions were icy, he heard screeching tires before the collision, and defendant's vehicle passed his tow truck traveling at a high rate of speed. From this a reasonable juror could infer that, had defendant been traveling at a reasonable speed for conditions, it may have been practicable for him to come to a complete stop, or significantly slow his speed before proceeding, without departing from the right lane of I-40 West.

Therefore, substantial evidence supported submission of the failure to maintain lane control charge to the jury. The trial court did not err in denying defendant's motion to dismiss this charge.

### 4.    Second-Degree Murder

Defendant argues that the State failed to present substantial evidence of certain elements of second-degree murder. We disagree.

In the instant case, the jury was instructed that defendant would need to be found guilty of either DWI or failure to maintain lane control to be guilty of second-degree murder. *See State v. Wilson*, 345 N.C. 119, 123, 478 S.E.2d 507, 510 (1996) (limiting review of substantial evidence supporting conviction to limited theory of conviction on which jury was instructed). On appeal, defendant does not dispute that the State presented substantial evidence that he drove the car that hit Mr. Nolasco and proximately caused his death. Defendant's only argument is that a lack of

substantial evidence supporting malice and either DWI or failure to maintain lane control mandates reversal of his conviction for second-degree murder.

Because we uphold defendant's conviction for failure to maintain lane control, our only remaining task is to determine whether the State presented substantial evidence of defendant's malice in the commission of this offense.

> Second-degree murder is an unlawful killing with malice, but without premeditation and deliberation. Intent to kill is not a necessary element of second-degree murder, but there must be an intentional act sufficient to show malice. . . . Accordingly, in [cases where the defendant is charged with committing second-degree murder by vehicle], it [i]s necessary for the State to prove only that [the] defendant had the intent to perform the act of driving in such a reckless manner as reflects knowledge that injury or death would likely result, thus evidencing depravity of mind. The State [i]s not required to show that [the] defendant had a conscious, direct purpose to do specific harm or damage, or had a specific intent to kill.

*Rich*, 351 N.C. at 395, 527 S.E.2d at 304 (internal quotation marks and citations omitted).

Viewing the evidence in a light most favorable to the State, defendant was driving while his license was revoked both for prior DWI and non-DWI offenses. He failed to insure his car. It was late at night, and road conditions were icy. Defendant was driving at a speed that was irresponsible in these driving conditions and did not allow him to maintain control of his vehicle and make safe maneuvers around potential hazards. He became aware that a tow truck with flashing lights was in the

process of loading another car onto its rollback, sitting partially within his current lane of traffic. Rather than switching to the left lane as Mr. Phillips did, defendant veered his vehicle to the right in an attempt to pass the tow truck along the shoulder of the interstate. In so doing, he was unaware of what additional obstacles or people may be on the portion of the shoulder obstructed from his view by the tow truck. *See State v. Schmieder*, __ N.C. App. __, __, 827 S.E.2d 322, 328 (finding substantial evidence of malice where, in addition to extensive driving record, defendant "was driving above the speed limit, following too close to see around the cars in front of him, and passing across a double yellow line without using turn signals"), *disc. rev. dismissed*, 372 N.C. 711, 830 S.E.2d 832 (2019).

Defendant lost control of his vehicle and hit the guard rail, the tow truck, and Mr. Nolasco. He stopped briefly. The collision was so severe that it ripped the front bumper from his car, cracked the windshield, broke the headlights, and deployed the airbags. Despite the severity of the collision, defendant did not try to ascertain if anyone was harmed or attempt to render assistance of any sort. He drove away and washed his car, suggesting he was aware that he had hit someone and needed to remove blood and other evidence from his vehicle. *See State v. Tellez*, 200 N.C. App. 517, 525, 684 S.E.2d 733, 739 (2009) (finding substantial evidence of malice where, among other things, defendant fled scene of accident and took steps to avoid apprehension without rendering any assistance or checking on safety of others

involved in accident). In his interactions with law enforcement officers at his home, he casually downplayed the severity of the collision despite being informed that he had killed someone.

The State published a redacted version of defendant's extensive driving record to the jury. In addition to six speed-related offenses, two willful refusals to submit to a chemical test for intoxicants, and two prior convictions for driving while license revoked, defendant's driving record revealed that his license was revoked for a DWI conviction at the time of the collision. The jury also heard testimony from a law enforcement officer that arrested defendant on suspicion of DWI on a prior occasion. Defendant had boasted to this officer that he "kn[e]w how to work [the system]" and avoid the consequences of his conduct behind the wheel. Furthermore, defendant's driving record revealed that he had been involved in five car accidents in the last twenty years, two of which caused personal injury. *Schmieder*, __ N.C. App. at __, 827 S.E.2d at 326 ("This Court has held evidence of a defendant's prior traffic-related convictions admissible to prove the malice element in a second-degree murder prosecution based on vehicular homicide. Likewise, whether defendant knew that he was driving with a suspended license tends to show that he was acting recklessly, which in turn tends to show malice.") (internal quotation marks, citations, and alterations omitted). Thus, the jury could infer that defendant was aware of the risk to human life caused by his behavior on the road.

From all this evidence, the jury could infer that defendant was well aware of the dangers to human life posed by his pattern of behavior behind the wheel, and on this occasion once again engaged in dangerous driving with indifference to its consequences. Therefore, substantial evidence supported the element of malice by reckless disregard for human life. Accordingly, the trial court did not err in submitting the second-degree murder charge to the jury.

### B.     Motion to Suppress and Admission of Witness Testimony

Defendant next argues that the trial court erred in denying his motion to suppress evidence obtained as fruits of the search of his two cellular phones. He further argues that the trial court erred in admitting the testimony of Ms. Haynes relating to his prior use of crack cocaine.

We have determined that substantial evidence supported defendant's second-degree murder conviction on the theory of failure to maintain lane control with malice. We have also reversed defendant's conviction for DWI. We agree with the concession of defendant's counsel at oral argument: the evidence obtained from his cell phones was used solely to prove his impairment at the time of the collision. Because we have vacated the driving while impaired conviction, we need not address defendant's arguments regarding the alleged error in the denial of defendant's motion to suppress and admission of evidence obtained as fruits of the search of his phones. Because this evidence is not relevant to the remaining charges, any error is harmless.

### C.    Jury Instruction on Accident

Defendant's final argument is that the trial court erred by denying his request for a jury instruction on accident.  Accepting defendant's position *arguendo*, we find this error harmless in light of other instructions given to the jury.

"The defense of accident is triggered in factual situations where a defendant, without premeditation, intent, or culpable negligence, commits acts which bring about the death of another."  *State v. Riddick*, 340 N.C. 338, 342, 457 S.E.2d 728, 731 (1995) (internal quotation marks and citation omitted).  We have previously held that failure to give an instruction on accident in a trial court's instructions on murder is harmless error if the jury is instructed on lesser-included offenses that do not require a *mens rea* of intent.  *Id.* at 343-44, 457 S.E.2d at 732.  In *Riddick*, the trial court gave an instruction on involuntary manslaughter as a lesser-included offense and the jury found the defendant guilty of first-degree murder.  *Id.*  Assuming *arguendo* that failure to give an accident instruction was error, we held that this error was harmless. *Id.*  Because first-degree murder requires specific intent to kill, we reasoned that the jury's verdict expressed rejection of any notion that defendant's conduct was accidental.  *Id.*

In the instant case, the trial court instructed the jury on second-degree murder and the lesser-included offenses of involuntary manslaughter and misdemeanor death by vehicle, noting that both lesser offenses involved killings that were

unintentional. The jury chose to convict defendant of second-degree murder, which requires a *mens rea* of malice: that defendant intentionally performed "an inherently dangerous act or omission, done in . . . a reckless and wanton manner . . . manifest[ing] a mind utterly without regard for human life and social duty and deliberately bent on mischief." N.C. Gen. Stat. § 14-17(b)(1) (2019). As in *Riddick*, the jury's verdict rejects the notion that defendant's passing of the tow truck along the shoulder was unintentional. Therefore, any error in failing to give an instruction on accident was harmless.

## III.    Conclusion

For the foregoing reasons, we reverse defendant's convictions for DWI and felony death by vehicle due to insufficient evidence of impairment. Defendant's trial was otherwise free of prejudicial error.

REVERSED IN PART; NO ERROR IN PART.

Chief Judge MCGEE and Judge ZACHARY concur.