IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-494

No. COA20-198

Filed 21 September 2021

Caldwell County, No. 13 CRS 54340

STATE OF NORTH CAROLINA

v.

NANCY BENGE AUSTIN

Appeal by defendant from judgment entered 24 May 2019 by Judge Lisa C. Bell in Caldwell County Superior Court. Heard in the Court of Appeals 14 April 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Mary Carla Babb, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Daniel K. Shatz, for defendant.*

DIETZ, Judge.

¶ 1    Defendant Nancy Austin appeals her conviction for first degree murder after she shot and killed Dylan Short in her driveway.

¶ 2    Just before the shooting, Short drove his car into Austin's driveway knowing that he was not welcome there and refused to leave. Short then shoved Austin's adult daughter, in view of Austin, and a fight broke out. After Austin pulled out a gun and demanded that Short leave her property, Short reached for the gun and, at some point, a gunshot went off. After further fighting, a bystander saw Austin standing

over Short, who lay on the ground in the driveway pleading "Please, please, just let me go. Let me go." Austin then stepped several feet back and shot Short in the head, killing him.

¶ 3    The State charged Austin with murder, and Austin asserted the castle doctrine defense, which is codified in North Carolina General Statute § 14-51.2. The trial court declined to resolve the defense in a pre-trial hearing and also denied Austin's motion to dismiss at trial, concluding that there were fact issues to be resolved by a jury.

¶ 4    As explained below, the trial court properly declined to resolve the castle doctrine defense before trial. Where, as here, there are fact disputes concerning the castle doctrine's applicability, those fact questions must be resolved by a jury. The trial court also properly denied the motion to dismiss because the State presented sufficient evidence to rebut the castle doctrine's presumption in favor of the lawful occupant of a home, thus creating a fact issue concerning the doctrine's applicability. Finally, the trial court's jury instructions, viewed as a whole, properly instructed the jury on the elements of the castle doctrine. We therefore reject Austin's arguments and find no error in the trial court's judgment.

## Facts and Procedural History

¶ 5    In 2013, Defendant Nancy Austin lived in a home with her daughter, Sarah, and Sarah's child. Dylan Short is the father of Sarah's child. Short was once in a relationship with Sarah, but the two later broke up.

¶ 6        After a violent incident between Short and Sarah at Austin's home in the summer of 2012, Austin told Short he was not welcome on the property. Sarah resumed a relationship with Short in November 2013. In December 2013, Austin and Short exchanged Facebook messages in which Austin disapproved of Short's relationship with her daughter. Austin also accused Short of attempting to run her off the road, which he acknowledged.

¶ 7        On 26 December 2013, Short spent the day with Sarah and then followed her home without her permission. Short had not been to the house in over a year. Austin was outside in the driveway, near a "no trespassing" sign, when Short arrived. Sarah, who had already arrived, got out of her car and took her child inside.

¶ 8        Short yelled at Sarah to stop and to talk to him. Austin told Short to leave. Sarah also told Short to leave, and Short then pushed her. Short was unarmed at the time. At this point, Austin took out a gun, pointed it at Short, told her daughter to go inside, and told Short to leave. Short refused to leave, telling Austin he did not have to leave because his child was inside the home.

¶ 9        Austin testified that she looked to see if her daughter had gone inside and, when she turned back, Short had "jumped" on her and reached for the gun. As Sarah was walking inside, she heard a gunshot. When she turned back around, Short and Austin were entangled, and Short was reaching around Austin's back toward the gun. Sarah ran toward them and pushed Short. Sarah fell to the ground with Short,

struggled with him, then moved on top of him and put her hands around his neck. Sarah got up again to go back into the house and, as she walked away, heard a second gunshot. She turned around and saw that Austin, who was standing up at this time, had shot Short, who was on the ground. Austin told Sarah to call 911, which she did.

¶ 10    In statements to police officers that evening, Austin explained that she had previously told Short not to come on her property, that when he arrived, she told him to leave, and that Short refused to leave. She also told the officers about the struggle in the driveway and that Short had knocked her to the ground and grabbed for her gun. Lastly, she told the officers that Short was on the ground and within three feet of her when she shot him.

¶ 11    The State charged Austin with the first degree murder of Short. The case went to trial. At trial, Billy Herald, who was working on a nearby property about twenty-five to forty yards away from Austin's home, testified that he had witnessed some of the incident. Herald testified that he saw Sarah drive into Austin's driveway at a fairly high speed and then saw Short pull up behind her, yelling at her to stop. Herald stopped watching until he heard Short shout, "she's got a loaded gun," a few minutes later. He looked back and saw Short on his left knee with his hand up, and Austin pointing a gun at him. He stopped watching again and then, shortly after, he heard a gunshot. He looked back and saw Short behind Austin and Austin's daughter jumping on top of Short, then Short falling to the ground. Herald testified that he

then saw Austin stand over Short, take two steps back, and then shoot Short at a distance of five to six feet away. Before Austin shot Short, Herald heard him say, "Please, please, just let me go. Let me go."

¶ 12        Dr. Patrick Lantz, who performed the autopsy, testified that Short died from a single gunshot wound to the face. Lantz stated that he observed stippling on Short's face, indicating that the shooting occurred at an intermediate range. Finally, Lantz testified that he would not expect stippling of this nature in a shooting with a range farther than three feet, but that it would depend on the ammunition used.

¶ 13        On 24 May 2019, the jury found Austin guilty of first degree murder and the court sentenced her to life without parole. Austin gave notice of appeal in open court.

**Analysis**

¶ 14        Every issue Austin asserts on appeal concerns some aspect of a self-defense provision in our General Statutes commonly called the "castle doctrine." *See* N.C. Gen. Stat. § 14-51.2.

¶ 15        "The 'castle doctrine' is derived from the principle that one's home is one's castle and is based on the theory that if a person is bound to become a fugitive from her own home, there would be no refuge for her anywhere in the world." *State v. Cook*, 254 N.C. App. 150, 157, 802 S.E.2d 575, 579 (2017) (Stroud, J. dissenting). The castle doctrine is a form of self-defense, but it is broader than the traditional self-defense doctrine because, when the statutory criteria are satisfied, the defendant no longer

has the burden to prove key elements of the traditional self-defense doctrine. N.C. Gen. Stat. § 14-51.2(b). With this overview in mind, we turn to Austin's specific arguments on appeal.

## I.     Pre-trial determination of castle doctrine defense

¶ 16     Austin first argues that the trial court erred by refusing to adjudicate her castle doctrine defense in a pre-trial hearing. Austin contends that, when a criminal defendant asserts the castle doctrine defense and moves to dismiss, the defendant has "the right to have a judge, rather than a jury, evaluate the evidence to determine whether she was immune under the statute."

¶ 17     Austin's argument turns on the specific language in the operative portion of the castle doctrine statute, which provides that a person satisfying the castle doctrine criteria "is immune from civil or criminal liability." N.C. Gen. Stat. § 14-51.2(e). Austin argues that the use of the word "immunity" means that this is a question that must be resolved by the judge, not the jury.

¶ 18     The flaw in this argument is that the word "immunity" has different legal meanings depending on the context and, here, the context indicates that this is not a traditional immunity from prosecution that must be resolved by the court before trial. A traditional immunity is "not merely an affirmative defense to claims; it is a complete immunity from being sued in court." *Ballard v. Shelley*, 257 N.C. App. 561, 564, 811 S.E.2d 603, 605 (2018). In other words, it creates not merely an assurance

that no judgment can be entered against the person, but a right not to be forced into court to defend oneself. *Id.*

¶ 19 In the criminal context, the General Assembly signals a grant of this type of immunity by referring to it as "immunity from prosecution." So, for example, the statute requiring trial courts to resolve an immunity issue pre-trial applies when the defendant "has been granted immunity by law from prosecution." N.C. Gen. Stat. § 15A-954(a)(9). This type of immunity often arises when the government seeks to compel a person to testify who might otherwise assert the right against self-incrimination. *See generally* N.C. Gen. Stat. § 15A-1051 *et seq.*

¶ 20 Our General Statutes use the phrase "immunity from prosecution" repeatedly when describing this type of immunity in the criminal context. *See*, *e.g.*, N.C. Gen. Stat. § 14-205.1 (granting "immunity from prosecution" to minors involved in soliciting prostitution); N.C. Gen. Stat. § 75-11 (granting "full immunity from criminal prosecution and criminal punishment" to persons compelled to testify against a corporation in certain consumer cases); N.C. Gen. Stat. § 90-96.2 (granting "limited immunity from prosecution" in the context of reporting drug overdoses); N.C. Gen. Stat. § 90-113.27 (granting "immunity from prosecution" to certain participants in needle exchange programs).

¶ 21 Here, by contrast, the castle doctrine provides immunity from "criminal liability." In this context, the immunity is from a conviction and judgment, not the

prosecution itself. This conclusion is further supported by the distinction between traditional immunities from prosecution, which typically involve little or no fact determination, and the castle doctrine defense, which, as explained below, can involve deeply fact-intensive questions. Accordingly, we reject Austin's argument that the castle doctrine statute granted her "the right to have a judge, rather than a jury, evaluate the evidence to determine whether she was immune under the statute." Where, as here, the trial court determined that there were fact questions concerning the applicability of the castle doctrine defense, the trial court properly permitted the case to proceed to trial so that a jury can resolve those disputed facts.

## II. Motion to dismiss

¶ 22        Austin next argues that the trial court erred by denying her motion to dismiss for insufficiency of the evidence, based on the castle doctrine and a lack of premeditation and deliberation.

¶ 23        "This Court reviews the trial court's denial of a motion to dismiss de novo." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). When a criminal defendant moves to dismiss, "the trial court is to determine whether there is substantial evidence (a) of each essential element of the offense charged, or of a lesser offense included therein, and (b) of defendant's being the perpetrator of the offense." *State v. Earnhardt*, 307 N.C. 62, 65–66, 296 S.E.2d 649, 651 (1982). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *State v. Smith*, 300 N.C. 71, 78, 265 S.E.2d 164, 169 (1980). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994).

The castle doctrine functions by creating a presumption of reasonable fear of imminent death or serious bodily harm in favor of a lawful occupant of a home, which in turn justifies the occupant's use of deadly force. N.C. Gen. Stat. § 14-51.2. Specifically, the statute provides that the "lawful occupant of a home" is "presumed to have held a reasonable fear of imminent death or serious bodily harm to himself or herself when using defensive force that is intended or likely to cause death or serious bodily harm to another" if both of the following apply: (1) "The person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a home," and (2) the person using "defensive force knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred." N.C. Gen. Stat. § 14-51.2(b)(1)–(2). The statute's definition of "home" includes the home's curtilage, such as the driveway at issue in this case. N.C. Gen. Stat. § 14-51.2(a)(1).

In effect, this provision eliminates the needs for lawful occupants of a home to show that they reasonably believed the use of deadly force was necessary to prevent

imminent death or serious bodily injury to themselves or others—a requirement of traditional self-defense. Instead, that belief is presumed when the statutory criteria are satisfied.

¶ 26    But, importantly, the statute has a separate section providing that this presumption "shall be rebuttable" and "does not apply" in certain circumstances set out in the statute:

> The presumption set forth in subsection (b) of this section shall be rebuttable and does not apply in any of the following circumstances:
>
> (1) The person against whom the defensive force is used has the right to be in or is a lawful resident of the home, motor vehicle, or workplace, such as an owner or lessee, and there is not an injunction for protection from domestic violence or a written pretrial supervision order of no contact against that person.
>
> (2) The person sought to be removed from the home, motor vehicle, or workplace is a child or grandchild or is otherwise in the lawful custody or under the lawful guardianship of the person against whom the defensive force is used.
>
> (3) The person who uses defensive force is engaged in, attempting to escape from, or using the home, motor vehicle, or workplace to further any criminal offense that involves the use or threat of physical force or violence against any individual.
>
> (4) The person against whom the defensive force is used is a law enforcement officer or bail bondsman who enters or attempts to enter a home, motor vehicle, or workplace in the lawful performance of his or her official duties, and the officer or bail bondsman identified himself or herself in accordance with any applicable law or the person using

> force knew or reasonably should have known that the
> person entering or attempting to enter was a law
> enforcement officer or bail bondsman in the lawful
> performance of his or her official duties.
>
> (5) The person against whom the defensive force is used (i)
> has discontinued all efforts to unlawfully and forcefully
> enter the home, motor vehicle, or workplace and (ii) has
> exited the home, motor vehicle, or workplace.

N.C. Gen. Stat. § 14-51.2(c).

¶ 27    One fair reading of this provision is that the presumption is rebuttable *only* in the five enumerated circumstances listed in the statute. That is, the statute announces that the presumption can be overcome and then provides the only five specific factual scenarios in which that is so.

¶ 28    But this Court and our Supreme Court rejected that interpretation several years ago. In *State v. Cook*, law enforcement officers kicked the door to the defendant's bedroom while executing a search warrant and the defendant fired two shots at the door, narrowly missing one of the officers. The defendant asserted that he did not hear the officers announce their presence, that he thought an intruder was breaking into his house, that he was scared for his life, and that "he did not take aim at or otherwise have any specific intent to shoot the 'intruder' when he fired the shots." 254 N.C. App. 150, 152, 802 S.E.2d 575, 577 (2017), *aff'd*, 370 N.C. 506, 809 S.E.2d 566 (2018).

¶ 29    The dissenting judge in the Court of Appeals argued that the defendant was

entitled to a castle doctrine instruction and the trial court erred by refusing to provide that instruction. *Id.* at 160, 802 S.E.2d at 581. The majority rejected that assertion, holding that "a defendant who testifies that he did not intend to shoot the attacker is not entitled to an instruction under N.C. Gen. Stat. § 14-51.2 because his own words disprove the rebuttable presumption that he was in reasonable fear of *imminent* harm." *Id.* at 156, 802 S.E.2d at 578. The Supreme Court affirmed the Court of Appeals in a *per curiam* decision. *State v. Cook*, 370 N.C. 506, 809 S.E.2d 566 (2018).

¶ 30        We are bound by *Cook* to hold that the castle doctrine's rebuttable presumption is not limited to the five scenarios listed in the statute. Instead, as explained in *Cook*, if the State presents substantial evidence from which a reasonable juror could conclude that a defendant did not have a reasonable fear of imminent death or serious bodily harm, the State can overcome the presumption and create a fact question for the jury. Thus, the castle doctrine, as interpreted in *Cook*, is effectively a burden-shifting provision, creating a presumption in favor of the defendant that can then be rebutted by the State.

¶ 31        Here, the State presented evidence that a bystander saw Austin standing over Short, who was lying unarmed in Austin's driveway and pleading "Please, please, just let me go. Let me go." The bystander saw Austin take several steps back and then shoot Short in the head from three to six feet away. Taken in the light most favorable to the State, this is sufficient evidence from which the jury could determine that the

State had rebutted the presumption and shown that Austin did not have a reasonable fear of imminent death or serious bodily harm when she shot Short in the head as he lay on the ground in her driveway.

¶ 32      Likewise, this evidence readily is sufficient to overcome a motion to dismiss based on lack of premeditation and deliberation. *See State v. Childress*, 367 N.C. 693, 695, 766 S.E.2d 328, 330 (2014). Accordingly, the trial court did not err by denying Austin's motion to dismiss.

### III.      Jury instruction on Section 14-51.2

¶ 33      Finally, Austin argues that the court erred in its jury instruction on the castle doctrine and that this error prejudiced her.

¶ 34      This Court reviews challenges to the trial court's jury instructions *de novo*. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). We examine the instructions "as a whole" to determine if they present the law "fairly and clearly" to the jury. *State v. Chandler*, 342 N.C. 742, 751–52, 467 S.E.2d 636, 641 (1996). The purpose of a jury instruction "is to give a clear instruction which applies the law to the evidence in such manner as to assist the jury in understanding the case and in reaching a correct verdict." *State v. Smith*, 360 N.C. 341, 346, 626 S.E.2d 258, 261 (2006). An error in jury instructions "is prejudicial and requires a new trial only if there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial." *State v. Dilworth*, 274 N.C.

App. 57, 61, 851 S.E.2d 406, 409 (2020).

¶ 35        Here, the court instructed the jury that "Nancy Austin was justified in using deadly force if . . . [she] reasonably believed that the degree of force she used was necessary to prevent an unlawful and forceful entry or to terminate Dylan Short's unlawful and forcible entry into her home." The court then instructed the jury on the castle doctrine using language that mirrors the statute:

> Under North Carolina law, a lawful occupant of her home does not have a duty to retreat from an intruder under these circumstances. Furthermore, a person who unlawfully and by force enters or attempts to enter a person's home is presumed to be doing so with the intent to commit an unlawful act involving force or violence.
>
> In addition, Nancy Austin is presumed to have held a reasonable fear of imminent death or serious bodily harm to herself or another when using defensive force that is intended or likely to cause death or serious bodily harm if both of the following apply:
>
> One, Dylan Short was in the process of unlawfully and forcefully entering or had unlawfully and forcibly entered Nancy Austin's home; and Nancy Austin knew or had reason to believe that an unlawful and forcible entry or unlawful and forcible act was occurring or had occurred. The presumption of Nancy Austin's reasonable fear of imminent death or serious bodily harm may be rebutted if you find beyond a reasonable doubt that Dylan Short had discontinued all efforts to unlawfully and forcefully enter the home and that Dylan Short had exited the home.

¶ 36        Every portion of this instruction is an accurate statement of the law. Moreover, this language was crafted with significant input from the parties during the charge

conference.

¶ 37    During the conference, the trial court informed the parties that the court believed the castle doctrine presumption could be rebutted by evidence beyond the five enumerated criteria in the statute but explained that the court had not prepared any specific instructions on what additional evidence could be considered to rebut the presumption:

> One thing that was not discussed yesterday and has not been included in my draft [of the jury instructions] are the – we didn't discuss about the presumptions, the rebuttability of the presumption and what is required to rebut the presumption.
>
> I did bring up my interpretation of the statute being those five enumerated exceptions aren't the only – I don't think the statute says those are the limited reasons – or the limited ways in which the presumption can be rebutted, because of the way the statute's worded. But we didn't get to a discussion of that yesterday, so that is one part of your proposed instruction that's not included in the draft but wasn't intentionally excluded.

¶ 38    The State then explained that it believed the fifth enumerated criteria in the statute, N.C. Gen. Stat. § 14-51.2(c)(5), applied and that it was reluctant to propose additional instructions fleshing out other possible evidence that could rebut the presumption, beyond the express statutory criteria, because "the risk that the State would run, Your Honor – and we talked about it, trying to figure out some nonstatutory. Because the State's reading and interpretation of that is that these are

not just the only ways that this could be rebutted, but there are others. But since we don't have a lot of guidance with jury instructions – because they didn't even address the way that it could be rebutted, in the jury instruction. So we didn't want to go outside of what the law is providing in the statute, even though we do agree that there are additional ways that that could possibly be shown."

¶ 39     Ultimately, the court chose not to include any additional instructions on how the castle doctrine presumption could be rebutted and simply instructed the jury that the castle doctrine created a presumption. The court also included a statement, consistent with the statute, that the presumption automatically is rebutted if the State proved "beyond a reasonable doubt that Dylan Short had discontinued all efforts to unlawfully and forcefully enter the home and that Dylan Short had exited the home."

¶ 40     The crux of Austin's argument is that the State should be barred on appeal from arguing that the jury could consider any basis to rebut the presumption other than the specific statutory criteria in N.C. Gen. Stat. § 14-51.2(c)(5) because the State "expressly disavowed any reliance on any non-statutory basis to rebut the presumption" during the charge conference. We are not persuaded that the State's discussion with the trial court meant what Austin contends. But, in any event, the State, like any other party, cannot stipulate to what the law is. *State v. Hanton*, 175 N.C. App. 250, 253, 623 S.E.2d 600, 603 (2006). "In a criminal trial the judge has the

duty to instruct the jury on the law arising from all the evidence presented." *Smith*, 360 N.C. at 346, 626 S.E.2d at 261.

¶ 41 Importantly, the trial court did not instruct the jury that the statutory criteria in N.C. Gen. Stat. § 14-51.2(c)(5) was the only means of rebutting the presumption, which would not be an accurate statement of the law under *Cook*. Instead, the court instructed the jury, correctly, that Austin was "presumed to have held a reasonable fear of imminent death or serious bodily harm to herself or another." The court also instructed the jury that, if it found beyond a reasonable doubt that the specific statutory criteria in Section 14-51.2(c)(5) was satisfied, the presumption was rebutted as a matter of law. The court chose not to provide additional instructions to the jury concerning the particular circumstances, beyond the statutory criteria, that could overcome the presumption of reasonable fear of imminent death or serious bodily harm, instead leaving the jury to make that determination from the facts presented in the case.

¶ 42 When viewed as a whole, the trial court accurately instructed the jury on the castle doctrine defense and its rebuttable presumption using language that mirrored the statute. *Chandler*, 342 N.C. at 751–52, 467 S.E.2d at 641. We thus reject Austin's arguments with respect to the presumption instruction.

¶ 43 Austin also argues that the trial court erred by treating the castle doctrine as "distinct from self-defense" because "there is a unitary justification defense for the

use of defensive force." But again, the trial court properly instructed the jury on the issue of self-defense and the castle doctrine separately, using language that mirrored that statute and the applicable law. Indeed, Austin's trial counsel told the trial court that Austin had "no problem" with the castle doctrine and self-defense instructions being separated, stating that they "should be seen as separate" because there are "different elements." We thus reject this argument as well.

¶ 44 Finally, Austin also asserts several other instructional arguments that were not preserved in the trial court. We review these issues for plain error. *State v. Goforth*, 170 N.C. App. 584, 587, 614 S.E.2d 313, 315 (2005). "For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012). Plain error is "applied cautiously and only in the exceptional case" where the error "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings." *Id.* Here, because the trial court's instructions as a whole properly instructed the jury on the law concerning self-defense and the statutory castle doctrine, we find no error with respect to these unpreserved instructional arguments and certainly no plain error.

## Conclusion

¶ 45 We find no error in the trial court's judgment.

NO ERROR.

Judges ZACHARY and HAMPSON concur.