An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 24-844

Filed 17 September 2025

Wake County, Nos. 21CR002147-910, 21CR216866-910

STATE OF NORTH CAROLINA

v.

LUIS MARIO VELASQUEZ-GUEVARA

Appeal by defendant from judgment entered 20 March 2024 by Judge A. Graham Shirley in Superior Court, Wake County. Heard in the Court of Appeals 28 August 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Megan Elizabeth Shook, for the State.*
>
> *Stephen G. Driggers, for the defendant.*

ARROWOOD, Judge.

Luis Velasquez-Guevara ("defendant") appeals from a jury verdict finding him guilty of first-degree murder, assault with a deadly weapon with intent to kill or inflict serious injury, and attempted murder and subsequent imposition of a sentence of life imprisonment without the possibility of parole. For the following reasons, we hold that defendant received a fair trial free of prejudicial error.

## I. Factual Background

On the evening of 20 October 2021, Gary Hansen ("Mr. Hansen") was living at the Oxford Square Apartments in Cary, North Carolina. As he was preparing to leave his apartment to see his wife and daughter, he noticed a group of four men talking amongst each other for at least fifteen minutes; he then heard five to seven gunshots and saw a man lying on the ground, not moving. Two of the men engaged in a panicked conversation, exchanged what Mr. Hansen told the 911 operator was a weapon,[1] then the man Mr. Hansen described as the shooter fled on foot while the second got into a BMW and drove off rapidly. Mr. Hansen testified that the man who fled on foot wore a baseball shirt with dark sleeves.

A video recording from a surveillance camera set up in the apartment complex showed four men gathered in a parking lot; they appeared to be conversing, then an individual in a white shirt with dark sleeves began firing a weapon. One man fell to the ground, while another fled, eventually pursued by the man in the white shirt. Video from a second camera then showed the man in the white shirt chase the other individual into the woods, where he ended the pursuit and walked back toward the scene of the shooting. A second video from the first camera showed the man with the white shirt running into the parking lot, where he entered the driver's door of a BMW that had just then arrived; the BMW then drove off.

---

[1] During closing arguments, the State theorized that this may have been an ammunition magazine.

Captain Victor Almeyda ("Captain Almeyda") of the Cary Fire Department was on a call in the Hampshire Court area of Cary when he heard a series of pops that he believed were fireworks. Soon afterward, he received a call to respond to Village Greenway, in the Oxford Apartments area. As he and his crew arrived in the area, they encountered a dark sedan travelling at a high rate of speed through the neighborhood; they attempted to cut if off, but it drove around them and continued past them.

At the scene of the shooting, Captain Almeyda found one individual who was already deceased, and a second wounded individual, who had gunshot wounds in his back, knee, and ear. The wounded individual, who was later identified as Gustavo Ramos-Lemus ("Mr. Lemus"), was transported to WakeMed Raleigh hospital. He was interviewed by police that evening and his cell phone was taken into evidence; he was unable to be located to testify at trial.

Ashely Cochran ("Ms. Cochran"), an investigator with the Raleigh-Wake City-County Bureau of Identification, arrived at the scene around 9:00 p.m. She identified the decedent as Gilbert Guzman. Mr. Guzman had a Gucci brand "COVID mask," a car key, $4,300.00 cash in his back pocket, and $59.00 cash in his front pocket. Mr. Guzman's body, which had been shot multiple times, was surrounded by fourteen .40 caliber cartridge casings; an additional cartridge casing was also found in the woods into which Mr. Lemus had run. Dr. Kimberely Janssen of the Office of the Chief

Medical Examiner performed an autopsy of Mr. Guzman on 22 October, from which she formed the opinion his death was a homicide.

Detective Laura Letsinger ("Detective Letsinger"), a digital forensics examiner in the Cary Police Department, began an investigation by way of videos from cameras set up in the neighborhood. Based on what she saw in these videos, Detective Letsinger compiled a "be-on-the-lookout" bulletin with images of the suspects' car pulled from the videos. Detective Letsinger also attempted to perform cell phone extractions on the cell phones recovered during the investigation. She was unable to extract any data from Mr. Lemus' phone, as it was encrypted, but she succeeded with a black Orbic flip phone, and white iPhone, and a phone found in Mr. Guzman's truck.

Detective Andrew Mauer ("Detective Mauer") was serving on an FBI task force and assisting the Cary Police Department with investigations at the time of the shooting. He acquired Mr. Lemus' phone number through a request to WhatsApp and requested symmetric contacts, which are contacts that appear on both sides of a conversation. Detective Mauer eliminated some contacts, such as those from out of the country, and by process of elimination identified a contact as their "target." He requested a PIN register for the number from WhatsApp, which contained records associated with that the phone number. The account holder of this number was identified as living at 729 Grove Avenue, Raleigh, North Carolina 27606. Phone records revealed that multiple calls were placed between this phone and Mr. Lemus'

phone, who had this number saved in phone as "Tigre," in the hour before the shooting.

Sergeant Clinton Babb ("Sergeant Babb") of the Cary Police Department, then a corporal, was tasked with gathering as much information about the suspect vehicle as possible. Based on his knowledge of vehicles, he determined the suspect vehicle was 2006 to 2011 BMW 3 Series coupe. Sergeant Babb searched for defendant on Facebook, where he found pictures of a car with the same body style, make, model, and color as the suspect vehicle.

On 23 October, the Raleigh Police Department SWAT team was dispatched to the 729 Grove Avenue address to take defendant into custody. Defendant, another man later identified as Jason Ortiz ("Mr. Ortiz"), and a BMW were outside the home. Both men fled, with Ortiz firing at the police, before defendant was apprehended. Following defendant's arrest, the Raleigh Police Department executed a search warrant at this address. In one of the bedrooms police found a white shirt with blue sleeves, similar to the one seen in the surveillance video from the night of the shooting. Police also found defendant's identification card, his passport, mail with his name, and a cell phone with the number 919-770-7114, which was the number associated with the "Tigre" contact in Mr. Lemus' phone. Inside the BMW, officers found white sneakers, similar to those worn by the suspect in the surveillance footage, and the title to the BMW in defendant's name. Police recovered the handgun Mr.

Ortiz used; ballistics expert Dinah Moses determined the casings recovered at the scene of the homicide to have come from that gun.

On 9 November 2021, defendant was indicted on charges of murder, assault with a deadly weapon with intent to kill and inflicting serious injury, and attempted murder. Trial began 11 March 2024, lasting eight days and resulting in a jury verdict finding him guilty on all counts. Defendant was sentenced to life without the possibility of parole on 20 March 2024, and gave notice of appeal in open court.

## II.    Discussion

Defendant raises two issues on appeal: one, that the trial court erred by denying his motion to dismiss where the evidence only raised a suspicion that defendant was the shooter; and two, that the trial court erred by instructing the jury on the theory of acting in concert where the evidence did not support the instruction, and defendant was prejudiced by this instruction. We address each argument in turn.

### A.    Motion to Dismiss

"We review the trial court's denial of a motion to dismiss *de novo*. In doing so, we must determine whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Summey*, 228 N.C. App. 730, 733 (2013) (cleaned up). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Schmieder*, 265 N.C. App. 95, 101 (2019) (citation omitted). It is existing or real,

rather than imaginary, evidence; evidence that only raises a suspicion of the identity of the perpetrator requires the trial court to grant the motion to dismiss. *State v. Rose*, 339 N.C. 172, 192, 193 (1994). When considering a motion to dismiss, "the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *Id.* at 192–93 (quoting *State v. Sumpter*, 318 N.C. 102, 107 (1986)).

Defendant effectively concedes in his brief that he was present at the scene of the shooting and concedes that there was "sufficient evidence" to support all the theories of Mr. Guzman's murder. Defendant's argument is that, despite all the evidence, there was not sufficient evidence to determine whether it was defendant or Mr. Ortiz who was the actual shooter. We disagree.

Defendant characterizes the evidence against himself as "circumstantial," as no witnesses identified him as the shooter, nor does the surveillance video provide a clear image of the shooter's face. However, "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence." *State v. Nunez*, 204 N.C. App. 164, 168 (2010) (citation omitted). At trial, Mr. Hansen testified regarding the 911 call he made immediately following the shooting, where he stated that the man who shot Mr. Ortiz was wearing a white baseball shirt with colored sleeves, which video evidence supported. Detective Hamlin testified that while executing a search warrant at 729 Grove Avenue, he found a white shirt with blue

sleeves in a bedroom, matching the description Mr. Hansen gave. In this same room, Detective Hamlin found defendant's identification card in the pocket of a pair of jeans, defendant's passport, and mail addressed to defendant. As part of the search, Detective Hamlin and the officers searched the BMW in the driveway, in which they found a title under defendant's name, and white sneakers matching those the suspect in the surveillance video appeared to be wearing. Detective Hamlin further testified that Mr. Ortiz had not been charged in the shooting of Mr. Guzman, and that no one had identified him as the shooter.

It is possible that each piece of evidence implicating defendant was coincidental, and there was evidence that favored defendant, such as the fact that it was Mr. Ortiz that shot at police when they arrived to serve the search warrant. However, when considering a motion to dismiss, "the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. at 192–93. Defendant's likely presence at the scene, combined with clothes matching the description of what the shooter wore being found in places belonging to or under the control of defendant, produces more than a suspicion that defendant was the shooter. Even if the evidence here were to be considered "borderline," in such cases "our courts have consistently expressed a preference for submitting issues to the jury." *State v. Jenkins*, 167 N.C.

App. 696, 701 (2005) (quotation and citation omitted). Therefore, the trial court did not err in denying defendant's motion to dismiss.[2]

### B.     Acting in Concert Instruction

Defendant's second contention is that the trial court erred in giving a jury instruction on acting in concert, where the evidence was insufficient to support that instruction and thereby prejudiced defendant. We disagree.

Whether there was sufficient evidence at trial to support a particular jury instruction is question of law, and we review such questions *de novo*. *State v. Smith*, 263 N.C. App. 550, 558 (2019). "Acting in concert means that the defendant is present at the scene of the crime and acts together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime." *State v. Calderon*, 242 N.C. App. 125, 135 (2015) (cleaned up). A defendant need not have committed any criminal acts to be convicted of acting in concert; it is enough if he was present at the scene and there is sufficient evidence that the one who committed the criminal acts did so as part of a common plan with the defendant. *State v. Joyner*, 297 N.C. 349, 357 (1979).

During jury instructions, the trial court told the jury,

---

[2] The State argues that it proceeded on two theories: that either defendant was the shooter, or that he acted in concert with the shooter; and that both had sufficient evidentiary support such that the motion to dismiss was properly denied. Because support for only one theory is necessary to survive a motion to dismiss, the sufficiency of the evidence of acting in concert is more properly addressed under defendant's argument that the trial court gave an improper instruction based on this theory, which we address below.

> "If two or more persons join in a common purpose to commit a crime, each of them, if actually or constructively present, is guilty of the crime . . . . To be guilty, the defendant must aid or actively encourage the person committing the crime or in some way communicate [ ] to another person the defendant's intention to assist in its commission."

The evidence presented at trial was sufficient for the jury to convict defendant based on his assistance in the shooting. Sergeant Babb identified the car driven by the suspects in the apartment surveillance video as a 2006 to 2011 BMW 3 Series coupe; the BMW found in the driveway of defendant and Mr. Ortiz's home was a 2007 BMW 328i, titled to Velasquez Paint and Yard Services in Cary with the title application signed "Luis Velasquez." In addition to the evidence of the car, multiple phone calls were placed between defendant and Mr. Lemus in the hour leading up to the meeting where the shooting occurred. A BMW, matching every aspect of the one owned by defendant, was seen on camera circling the parking lot before the shooting.

During his 911 call, Mr. Hansen stated that he had seen the two men engaged in conversation after the shooting, during which conversation he saw a weapon exchanged, and at trial he testified that someone "put a weapon on top of a car." While defendant disputes the reliability of Mr. Hansen's 911 call while in an agitated state, and his subsequent, less specific testimony at trial, it is for the jury to determine the weight of testimony. Finally, Mr. Hansen testified that one of the individuals ran from the scene while the other entered the BMW and drove off; defendant himself admits that the driver of the BMW then picked up the other

individual. Even if defendant were not the shooter, despite the evidence indicating that he was, there was sufficient evidence presented from which the jury could draw the conclusion that defendant and Mr. Ortiz planned the shooting together, based on the presence of the BMW before the shooting, then the conversation, exchange of weapon, and pickup following the shooting.

Defendant cites to *State v. Malachi*, 371 N.C. 719 (2018) as guidance to determine the prejudicial effect of an unsupported jury instruction. However, we have already determined that there was sufficient evidence to support a jury instruction on acting in concert, which obviates any need to engage in a *Malachi* analysis. There was sufficient evidence for the jury to convict defendant on either the theory that defendant was the shooter, or that he was acting in concert with Mr. Ortiz. The trial court did not err in giving any instructions.

## III. Conclusion

For the foregoing reasons, we hold that defendant received a fair trial free from prejudicial error.

NO ERROR.

Judges COLLINS and FREEMAN concur.

Report per Rule 30(e).